1  KILPATRICK TOWNSEND & STOCKTON LLP
   GREGORY S. GILCHRIST (State Bar No. 111536)
2  ggilchrist@kilpatricktownsend.com
   RYAN T. BRICKER (State Bar No. 269100)
3  rbricker@kilpatricktownsend.com
   SOPHY MANES (State Bar No. 287583)
4  smanes@kilpatricktownsend.com
   HANNAH T. YANG (State Bar No. 311814)
5  hyang@kilpatricktownsend.com
   Two Embarcadero Center, Suite 1900
6  San Francisco, California  94111
   Telephone:  415 576 0200
7  Facsimile:   415 576 0300

8  Attorneys for Plaintiffs
   PATAGONIA, INC. and
9  PATAGONIA PROVISIONS, INC.

10

11            **UNITED STATES DISTRICT COURT**

12         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

14

15  PATAGONIA, INC. and                  Case No. 2:19-cv-02702-VAP-JEM
    PATAGONIA PROVISIONS, INC.,
16                                        **OPPOSITION TO MOTION TO**
           Plaintiffs,                    **DISMISS**
17
18         v.

19  ANHEUSER-BUSCH, LLC                   Date:    August 19, 2019
    dba PATAGONIA BREWING CO.,            Time:    2:00 p.m.
20                                        Court:   Courtroom 8A, 8th Floor
           Defendant.                     Judge:   Honorable Virginia A. Phillips
21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

<u>Page</u>

3

4

I.    INTRODUCTION ................................................................................. 1

5

II.   PLEADING STANDARDS ................................................................. 2

6

     A.    General Pleading Standard .......................................................... 2

7

     B.    Special Pleading Standard:  Fraud .............................................. 3

8

III.  CLAIM FIVE ADEQUATELY ALLEGES A CLAIM FOR
     INVALIDATION OF THE TRADEMARK BASED ON
     AN ILLEGITIMATE ASSIGNMENT. ............................................ 4

9

10

IV.  CLAIM SEVEN ALLEGES FRAUD ON THE PTO WITH
     PARTICULARITY. ............................................................................ 7

11

V.   CLAIM THREE FOR DILUTION IS SUFFICIENT. ...................... 12

12

     A.    The FAC Contains Sufficient Factual Allegations to
          Show the "Fame" Element of a Dilution Claim. ...................... 13

13

14

     B.    AB's Authorities Regarding Dilution Are
          Overblown, Distinguishable, or Irrelevantr to the
          Pleading Stage. ........................................................................ 15

15

16

     C.    The PATAGONIA Mark Is Sufficiently Distinctive
          to Support a Claim of Fame. .................................................... 17

17

     D.    AB's Motion for a More Definite Statement of Claim
          Three Is Baseless and Should Be Denied. ............................... 19

18

VI.  CLAIM SIX ADEQUATELY PLEADS FALSE
     SUGGESTION OF CONNECTION ............................................... 19

19

VII. THE FIFTH CLAIM PROPERLY PLEADS
     ABANDONMENT ............................................................................ 24

20

21

VIII. CONCLUSION ............................................................................... 25

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adidas Am., Inc. v. TRB Acquisitions LLC,*
    No. 3:15-cv-2113-SI, 2018 WL 4600291 (D. Or. Sept. 25, 2018) ....................... 11

*Aegis Software, Inc. v. 22nd Dist. Agric. Ass'n,*
    255 F. Supp. 3d 1005 (S.D. Cal. 2017) ................................................. 16

*ANT v. McPartlin,*
    No. CV 11-6975 PSG (Ex), 2012 WL 13012472 (C.D. Cal. May 30,
    2012) ............................................................................ 16, 17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................ 2, 3

*Ass'n Pour La Def. et La Promotion De Loeuvre De Marc Chagall Dite
    Comite Marc Chagall v. Bondarchuk,*
    No. 92042323, 2007 WL 749714 (T.T.A.B. Mar. 8, 2007) ................................ 21

*Avery Dennison Corp. v. Sumpton,*
    189 F. 3d 868 (9th Cir. 1999) ..................................................... 18, 19

*Bd. Of Tr. of the Univ. of Alabama v. BAMA-Werke Curt Baumann,*
    No. 13,291, 1986 WL 83709 (T.T.A.B. Aug. 6, 1986) .................................... 20

*Bell v. Harley-Davidson Motor Co.,*
    No. 05cv2151-L(BLM), 2007 WL 935588 (S.D. Cal. Mar. 6, 2007) ........................ 25

*Blue Sphere, Inc. v. Swift,*
    2014 WL 12575768 (C.D. Cal. Sept. 17, 2014) ......................................... 13

*In re Bose,*
    580 F.3d 1240 (Fed. Cir. 2009) ...................................................... 11

*Branding v. By Lee Tillett, Inc.,*
    940 F. Supp. 2d 1178 (C.D. Cal. 2013) ............................................ 18, 23

*Buffett v. Chi-Chi's, Inc.,*
    1985 WL 73060 (T.T.A.B. June 13, 1985) .............................................. 20

*Caymus Vineyards v. Caymus Med., Inc.,*
    No. 91204667, 2013 WL 6665451 (T.T.A.B. 2013) ........................................ 8

*Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,*
    892 F.2d 1021 (Fed. Cir. 1989) ...................................................... 24

*Cree, Inc. v. Fastbuy, Inc.,*
    No. CV 18-01802-CJC(ASx), 2018 WL 4850404 (C.D. Cal. July 16,
    2018) ......................................................................... 13, 14, 15

*CYBERsitter, LLC v. Google Inc.*,
  905 F. Supp. 2d 1080 (C.D. Cal. 2012) ..................................................... 3

*Dahon N. Am., Inc. v. Hon*,
  2012 WL 1413681 (C.D. Cal. Apr. 24, 2012) ...................................... 16, 17

*Daimlerchrysler Corp. v. Am. Motors Corp.*,
  No. 92045099, 2010 WL 302022 (T.T.A.B. Mar. 25, 2010) .................... 11

*Dallas Cowboys Football Club, Ltd. v. Am.
  's Team Props., Inc.,* 616 F. Supp. 2d 622 (N.D. Tex. 2009) ................... 17

*Delta Air Lines, Inc. v. Influence Direct, LLC*,
  No. 3-14-0926, 2016 WL 310068 (M.D. Tenn. Jan. 15, 2016) ............... 17

*Emerald Cities Collaborative, Inc. v. Roese*,
  666 F. Appx. 908 (Fed Cir 2016) ........................................................... 6, 7

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*,
  623 F.3d 61 (2d Cir. 2010) ........................................................................ 7

*Fruit of the Loom, Inc. v. Girouard*,
  994 F.2d 1359 (9th Cir. 1993) ................................................................. 15

*Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*,
  No. 99 C 7778, 2001 WL 709483 (N.D. Ill. June 25, 2001) .................... 8

*In re Gilead Scis. Secs. Litig.*,
  536 F. 3d 1049 (9th Cir. 2008) ............................................................... 13

*Global Apogee v. Sugarfina, Inc.*,
  No. CV 18-5162-RSWL-E, 2018 WL 4945305 (C.D. Cal., Oct. 10,
  2018) .......................................................................................................... 3

*Greene v. Ab Coaster Holdings, Inc.*,
  2012 WL 4442749 (S.D. Ohio Sept. 25, 2012) ......................................... 5

*In-N-Out Burgers v. Smashburger IP Holder LLC*,
  No. 8:17-cv-1474-JLS-DFM, 2017 WL 10402610 (C.D. Cal., Dec.
  21, 2017) ................................................................................................... 17

*Kim v. Ferry*,
  No. CV-08-05433-GAF (MANx), 2009 WL 10671425 (C.D. Cal.
  Feb. 18, 2009) ............................................................................................ 2

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
  495 F.2d 1265 (2d Cir. 1974) .................................................................. 24

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ..................................................................... 3

*Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*,
  170 F. Supp. 3d 1249 (C.D. Cal. 2016) ................................................. 2, 3

*Mattel Inc. v. Scott*,
  2006 WL 3472709 (T.T.A.B. Nov. 21, 2006) ........................................................ 17

*Meckatzer Lowenbrau Benedikt Weib KG v. White Gold, LLC*,
  No. 92051014, 2010 WL 1946273 (T.T.A.B. May 13, 2013) ............................. 12

*MGA Entm't, Inc. v. Dynacraft BSC, Inc.*,
  No. 2:17-cv-08222-ODW-KS, 2018 WL 2448123 (C.D. Cal. May 30,
  2018) ............................................................................................................ 15, 16

*Moore v. Kayport Package Exp., Inc.*,
  885 F.2d 531 (9th Cir. 1989) ............................................................................... 8

*Mophie, Inc. v. ABM Wireless, Inc.*,
  No. SACV 14-1422-JLS, 2015 WL 12791374 (C.D. Cal. May 19,
  2015) ............................................................................................................ 24, 25

*Nat'l Pork Bd. & Nat'l Pork Producers Council v. Supreme Lobster &
  Seafood Co.*,
  No. 91166701, 2010 WL 2513872 (T.T.A.B. June 11, 2010) ............................. 17

*Nat'l Sportswear v. Nat'l Sportswear, Inc.*,
  No. 92064690, 2017 WL 1476300 (T.T.A.B. Mar. 23, 2017) ............................. 20

*Neurovision Med. Prods., Inc. v. Nuvasive, Inc.*,
  No. 09-CV-6988 ................................................................................................ 11

*New York Yankees P'ship v. Evil Enters., Inc.*,
  2013 WL 1305332 (T.T.A.B. Feb. 8, 2013) ........................................................ 22

*Oculu, LLC v. Oculus VR, Inc.*,
  No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204, at *7 (C.D. Cal.
  June 8, 2015) ....................................................................................................... 5

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ............................................................................... 4

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
  897 F.3d 1008 (9th Cir. 2018) ............................................................................. 7

*Petróleos Mexicanos v. Intermix S.A.*,
  No. 92052292, 2010 WL 5574284 (T.T.A.B. Dec. 28, 2010) ........................ 21, 22

*Planet Coffee Roasters, Inc. v. Dam*,
  No. SACV 09-00571-MLG, 2009 WL 2486457 (C.D. Cal. Aug. 12,
  2009) ............................................................................................................ 16, 17

*Sebastian Brown Prods. LLC v. Muzooka Inc.*,
  No. 15-CV-01720-LHK, 2016 WL 949004 (N.D. Cal. Mar. 14, 2016) ................. 5

*SmileDirectClub, LLC v. Berkely*,
  No. SACV 18-1236 ............................................................................................. 10

*Strome v. DBMK Enters., Inc.*,
  No. 14-cv-02398-SI, 2014 WL 6485533 (N.D. Cal. Nov. 19, 2014) ........... 3, 4, 10

*T-4 Corp. v. McDonald's Corp.*,
    No. CV 17-08-M-DLC, 2017 WL 3037422 (D. Mont. July 17, 2017)................. 17

*The Clorox Co. v. Chemical Bank*,
    No. 23,559, 1996 WL 579826 (T.T.A.B. July 2, 1996) ............................ 5

*Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*,
    212 F. Supp. 3d 816 (N.D. Cal. 2016)........................................ 16

*Top Producer Sys. Inc. v. Software Scis. Ltd.*,
    43 U.S.P.Q.2d 1853, 1997 WL 723049 (D. Or. 1997)........................... 8

*Twiggy v. Tjx Cos., Inc.*,
    87 U.S.P.Q.2d 1411 (T.T.A.B. 2008)...................................... 22, 23

*Univ. of Notre Dame du Lac v. J.C. Food Imps. Co.*,
    703 F.2d 1372 (Fed. Cir. 1983) ........................................... 23

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) .................................................... 16

*Re White*,
    No. 78146926, 2006 WL2049628 (T.T.A.B. Jan. 4, 2006) .................... 23

**Statutes**

15 U.S.C. § 1052(a) .......................................................... 20

15 U.S.C. § 1064 ............................................................. 4

15 U.S.C. § 1064(3) .......................................................... 20

15 U.S.C. § 1065 ............................................................. 4

15 U.S.C. § 1125(c)(2)(A)(i)-(iv) ............................................ 13

15 U.S.C. § 1127 ............................................................ 24

Lanham Act Section 10(a) 15 U.S.C. § 1060(a)(1)..........................*passim*

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition § 31:67 (5th ed.)..................... 10

Fed. R. Civ. P. Rule 8(a) .................................................... 2

Fed. R. Civ. P. Rule 9(b) ................................................. 3, 4, 8

Fed. R. Civ. P. Rule 12(b)(6)............................................. 2, 3

Fed. R. Civ. P. Rule 12(e).................................................. 19

## I.     INTRODUCTION

Patagonia's[1] First Amended Complaint ("FAC") explains in great detail how Anheuser Busch, LLC ("AB") illegally acquired an intent-to-use trademark application ("ITU") from its competitor Warsteiner Imports Agency ("Warsteiner") for the trademark "PATAGONIA" for beer.  AB took the extraordinary step of having its own lawyers assume control over the ITU, making false statements to the PTO that Warsteiner, and not AB, was the owner of the ITU, and that Warsteiner had "used" the mark even though Warsteiner never used it before illegally assigning it to AB.  Through its lawyers, AB made these false statements because it knew the PTO would not issue the registration if, before having used the mark, Warsteiner assigned the ITU to AB.  Once AB obtained the registration resulting from this deceit, it shelved the trademark for at least six years.  Only after enough time had passed so that AB could proclaim the registration was incontestable – based on more misrepresentations to the PTO about the mark's use – did AB finally launch its PATAGONIA brand beer in the United States.

All of Patagonia's claims flow naturally from the consequences of AB's unlawful acquisition of the ITU, and AB's fraudulent statements to obtain the result-ing registration.  Claims One through Four are trademark infringement and dilution claims that seek to remedy the consumer confusion and brand erosion caused by AB's use of a PATAGONIA mark that is identical to Patagonia's famous brand and corporate identity.  Claims Five through Eight seek to cancel AB's trademark registration or rectify the register to ensure that AB is not able to take advantage of its illegally obtained registration or asserted incontestability.  Without the illegal registration, AB would not hold any rights in a PATAGONIA trademark, leaving it to defend the substantial confusion and misleading associations with Patagonia that AB's new brand has caused.

---

[1] Patagonia, Inc. and Patagonia Provisions, Inc. are collectively referred to as "Patagonia."

1      AB's motion to dismiss ("Motion") is a disguised motion for summary

2 judgment that fails the basic test of all motions to dismiss.  AB can easily discern

3 what claims Patagonia has pleaded, and cannot sustain any argument that the claims

4 are implausible under the alleged facts.  The facts do not reveal any inherent legal

5 barriers to the claims.  Despite the convention of parroting *Twombly* and *Iqbal* in

6 rote response to every action a defendant would rather not face (which contravenes

7 the Court's standing order regarding Rule 12(b)(6) motions), the federal pleading

8 standard still requires only fair notice of plausible claims.  The only "implausibility"

9 that has surfaced in the Motion is AB's contention that there is an innocent

10 explanation for AB's manipulation of the PTO in order to hide its unlawful

11 acquisition of the ITU.

12      The Motion never comes to grips with the FAC's pivotal allegations:  AB

13 violated the Lanham Act's prohibition on acquisitions of ITUs and then made a

14 series of misrepresentations to the PTO in order to hide this defect.  These allega-

15 tions are highly plausible based on the documents that AB itself recorded in the

16 PTO.  The inferences raised by these facts cannot be assumed away on a motion

17 to dismiss and require a full hearing with all of the relevant evidence before

18 Patagonia's claims can be decided.

19 **II.   PLEADING STANDARDS**

20      **A.   General Pleading Standard**

21      A complaint need only make a "short and plain" statement of the claim show-

22 ing that the plaintiff is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  A Rule 12(b)(6)

23 motion to dismiss tests the legal sufficiency of the complaint in light of Rule 8(a).

24 *Kim v. Ferry*, CV 08-05433 GAF (MANx), 2009 WL 10671425, at *3 (C.D. Cal.,

25 Feb. 18, 2009), *see also*, *Lions Gate Entm't Inc. v. TD Ameritrade Servs. Co., Inc.*,

26 170 F. Supp. 3d 1249, 1256 (C.D. Cal. 2016).  A motion to dismiss does not turn on

27 whether the plaintiff ultimately will prevail, but only whether the plaintiff has

28 alleged sufficient factual grounds to provide notice of the claim and a plausible basis

1   for relief.[2]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Defendant's arguments

2   throughout its Motion about the merits of the claims, accordingly, are improper at

3   the pleading stage.

4        In deciding a 12(b)(6) motion, the court must (1) construe the complaint

5   in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual

6   allegations as true, as well as all reasonable inferences to be drawn from them.

7   *Lions Gate*, 170 F. Supp. 3d at 1256; *see also*, *Lee v. City of Los Angeles*, 250 F.3d

8   668, 679 (9th Cir. 2001).  A determination of whether the complaint meets the

9   plausibility standard is a context-specific task that requires the court to draw on

10   its judicial experience and common sense.  *Id.* at 679.

11        If a district court nevertheless believes the claims are insufficiently pleaded,

12   the Ninth Circuit has held that the court should grant leave to amend.  *CYBERsitter,*

13   *LLC v. Google Inc.*, 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012) (citing *Lopez v.*

14   *Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000)).  A complaint "should not be dismissed

15   under Rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no

16   set of facts in support of his claim which would entitle him to relief.'"  *Global*

17   *Apogee v. Sugarfina, Inc.*, No. CV 18-5162-RSWL-E, 2018 WL 4945305, at *1

18   (C.D. Cal., Oct. 10, 2018).

19        **B.**    **Special Pleading Standard:  Fraud**

20        Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state

21   with particularity the circumstances constituting fraud or mistake."  This requires

22   identifying the "who, what, when, where, and how of the misconduct charged."

23   *Strome v. DBMK Enters., Inc.*, No. 14-cv-02398-SI, 2014 WL 6485533, at *4 (N.D.

24   Cal. Nov. 19, 2014).  Importantly, given the arguments AB offers on the fraud

25   claim, "[m]alice, intent, knowledge, and other conditions of a person's mind may be

26   alleged generally."  Fed. R. Civ. P. 9(b).  Fraud allegations must be specific enough

27

28   [2] AB has framed more than 200 written discovery requests about these claims, indicating that Patagonia's pleading is not so mysterious as AB's motion suggests.

1   "to give defendants notice of the particular misconduct which is alleged to constitute

2   the fraud charged so that they can defend against the charge and not just deny

3   that they have done anything wrong." *Strome*, 2014 WL 6485533, at *4 (internal

4   citations omitted); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 555 (9th Cir. 2007)

5   (holding that plaintiffs met Rule 9(b) when the court was "given no reason to

6   believe that defendants will be hampered in their defense").[3]

7   **III.   CLAIM FIVE ADEQUATELY ALLEGES A CLAIM FOR**

8   **INVALIDATION OF THE TRADEMARK BASED ON AN**
    **ILLEGITIMATE ASSIGNMENT.**

9         AB argues that the FAC does not state sufficient facts to cancel the

10  PATAGONIA trademark based on its invalid assignment.  Motion at 14-17.  The

11  FAC lays out clearly that Warsteiner assigned the ITU to AB before making or

12  showing use, a violation of the anti-trafficking rule in Section 10(a) of the Lanham

13  Act.  15 U.S.C. § 1060(a)(1) ("Section 10(a)").

14        Congress added the anti-trafficking rule to prevent the very type of abuse of

15  the intent-to-use application mechanism engaged in by AB.  The rule states that "no

16  application to register a mark under section 1051(b) of this title shall be assignable

17  prior to the … filing of the verified statement of use under section 1051(d) of this

18  title."  *Id.*  Section 10(a)'s lone exception, permitting assignment together with an

19  "existing business," requires that (i) the mark be in use, and (ii) the transferee

20

21  _____
    [3] AB's Motion spends considerable time claiming that its PATAGONIA trade-
22  mark is incontestable.  Despite the emphasis it receives, AB never explains why
    incontestability matters to Patagonia's specific claims and, in fact, incontestability
23  is not offered as grounds to defeat *any* of the claims AB has moved to dismiss.  The
    only claims that are affected by incontestability are the First through Fourth, but AB
24  does not move to dismiss the First or Second, and dismissal of the Third and Fourth
    claims is sought on other grounds.  *See* Motion 17-24.  AB ignores Patagonia's
25  numerous claims that will result in cancellation of AB's purported registration
    regardless of incontestability.  *See* 15 U.S.C. §§ 1064, 1065 (a mark is not incon-
26  testable if it "has been abandoned [Fifth claim], or its registration  was obtained
    fraudulently [Seventh claim] or contrary to the provisions of … subsection (a), (b),
27  or (c) of section 1052 [Sixth claim]").  An assignee likewise may not use incon-
    testability to shield an unlawful assignment [Fifth Claim] or a registration that has
28  not been in *bona fide* use continuously for five years [Eighth Claim].  *Id.*  AB's
    repeated references to "incontestability" are misleading.

acquire the ongoing business together with the mark.  *Greene v. Ab Coaster Holdings, Inc.*, No. 2:10-CV-38, 2012 WL 4442749, at *10 (S.D. Ohio Sept. 25, 2012) ("[Assignor], however, did not have 'an ongoing and existing business' related to the Ab Coaster mark in December 2006 at the time of the assignment."); *Sebastian Brown Prods. LLC v. Muzooka Inc.*, No. 15-CV-01720-LHK, 2016 WL 949004, at *8-9 (N.D. Cal. Mar. 14, 2016) (same).  AB does not argue that either condition for this exception is present.

Circumvention of Section 10(a) invalidates the registration *and* the transfer from Warsteiner to AB, and eliminates AB's ability to claim the rights of a "registrant."  *The Clorox Co. v. Chemical Bank*, No. 23,559, 1996 WL 579826, at *7 (T.T.A.B. July 2, 1996) ("any such prohibited assignment is not only invalid, … but the prohibited assignment also voids the application or any resulting registration"); *Oculu, LLC v. Oculus VR, Inc.,* No. SACV 14-0196 DOC(JPRx), 2015 WL 3619204, at *7 (C.D. Cal. June 8, 2015) ("Violating this 'anti-trafficking rule' voids the assignment as well as the underlying application and resulting registration.").

There are ample allegations in the FAC supporting the claim that AB's acqui-sition of the ITU violates Section 10(a).  The mark was assigned by Warsteiner to AB at the time that AB's lawyers took control of the application (May 14, 2012), two months before the July 17, 2012 statement of use was filed (the "Statement of Use").  FAC ¶¶ 27-29; *see also* ¶¶ 90-91.  Only AB, not Warsteiner, made prepara-tions to use the mark (e.g. filing for a certificate of label approval), again before the Statement of Use was filed.  *Id.* at ¶¶ 24, 25.  The transactional documents them-selves, excerpted in the FAC, confirm all of this, explicitly stating that the ITU was assigned.  *Id.* at ¶¶ 27-28.

AB does not deny (in fact, it concedes) the inference that these transactional documents were created before the PTO issued the registration, but suggests they were dated and filed later.  Motion at 17.  AB insinuates that there was a license by

1   Warsteiner (*id.* at 15) but the FAC is inconsistent with any *bona fide* license.  Even

2   if there were a license, a phony license cannot override the plain meaning of Section

3   10(a).  *See Emerald Cities Collaborative, Inc. v. Roese*, 666 F. Appx. 908 (Fed Cir.

4   2016) (holding that Section 10(a) violations cannot be avoided by a sham trans-

5   action).  If AB wants to justify the extraordinary circumstances surrounding the

6   alleged assignment with evidence of a *bona fid*e license (one that must have inex-

7   plicably initiated *five days* before the application lapsed), a motion to dismiss is

8   not the proper vehicle.

9        AB argues that Patagonia "ignore[s] the date recorded on the assignment and

10   the reasonable explanation that the assignment was *drafted* before registration but

11   *executed* after registration."  Motion at 8, fn. 5.  Patagonia does not ignore that the

12   assignment was drafted before the registration; it is the stated basis of Patagonia's

13   claims.  FAC ¶¶ 27-29.  Warsteiner assigned the ITU to AB and AB irrevocably

14   took control over the application, before the registration issued, as part of a scheme

15   to avoid Section 10(a).  Patagonia does *not* credit the execution date of the assign-

16   ment document, nor does the FAC.  If the assignment was not effective – as AB

17   appears to insist that undisclosed evidence will show – until the recorded execution

18   date, there is no explanation why AB's attorneys drafted and submitted to the PTO

19   an assignment of the "application."  There is no reason for AB to have (i) taken

20   control of the application (a few months before it expired), (ii) filed for certificate

21   of label approvals in AB's name, (iii) sworn to Warsteiner's use, or (iv) pretended to

22   the PTO that beer – actually sold, if by anyone, by Cerveceria Y Malteria Quilmes

23   S.A. ("Quilmes") to Import Brands Alliance – was sold by Warsteiner five days

24   before the application lapsed.  FAC ¶¶ 19-25.

25        AB's efforts to deceive the PTO, even if its intimations are true that

26   Warsteiner signed the assignment after the mark registered, are similar to those

27   in *Emerald Cities*.  There, the appeals court affirmed the TTAB's rejection of an

28   "argument that the Agreement was merely an 'agreement to assign in the future.'"

666 Fed. Appx. at 911.  As here, the assignment agreement in *Emerald Cities* was drafted before the trademark registered; did not purport to take effect until after the mark had registered; and the application was prosecuted by the assignee's own counsel.  *Id.* at 909-911.  The court concluded that the assignment, "when read in its entirety, *unambiguously* shows that [applicant] … relinquished[] immediate control and ownership of the intent-to-use application in a 'manner tantamount to an assign-ment.'"  *Id.* at 913 (emphasis added).  The FAC is more than adequate to put AB on notice that Patagonia is asserting (and has a plausible basis for asserting) that Warsteiner "relinquished[] immediate control"  of the application to AB in violation of Section 10(a) and the resulting registration should therefore be cancelled.[4]

## IV.   CLAIM SEVEN ALLEGES FRAUD ON THE PTO WITH PARTICULARITY.

AB never seriously suggests it cannot discern the specifics of Patagonia's fraud claim.  Rather, AB appears to discount the specific allegations of fraud because AB's experienced trademark lawyers managed to date the forms and file the required statements to the PTO on Warsteiner's behalf in the correct order, ignoring that AB acquired the application before these statements (falsely) were made.  This is not an argument about "particularity;" it is an argument about the merits.

The elements of a fraud-on-the-PTO claim include: (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representa-tion is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance.  *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1019 (9th Cir. 2018).

Although fraud must be pled with particularity, "[a] pleading is sufficient

---

[4] An unlawful assignment is grounds to cancel an incontestable registration.  *E.g., Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 69 (2d Cir. 2010) (holding "the question of the validity of the assignment is antecedent to the question of incontestability").

1   under Rule 9(b) if it identifies the circumstances constituting fraud so that a [party]

2   can prepare an adequate answer …. [w]hile statements of the time, place and nature

3   of the alleged fraudulent activities are sufficient, mere conclusory allegations of

4   fraud are insufficient." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540

5   (9th Cir. 1989). Applying this principle to fraud on the PTO, the court in *Top*

6   *Producer Sys. Inc. v. Software Scis. Ltd.*, No. 97-0415-MA, 1997 WL 723049

7   (D. Or. July 21, 1997) found that the allegations satisfied Rule 9(b) because

8   counterclaimant had "identif[ied] a specific document, the date it was filed with the

9   Patent and Trademark Office, and the alleged misrepresentations, namely that the

10  plaintiff failed to disclose that the term 'producer' had become generic." *Id.* at *3.

11       Patagonia need not allege every specific fact and circumstance surrounding

12  the fraud, but must "merely sketch the fraudulent scheme." *Gaffrig Performance*

13  *Indus., Inc. v. Livorsi Marine, Inc.*, No. 99 C 7778, 2001 WL 709483, at *4-*5

14  (N.D. Ill. June 25, 2001). Here, the FAC provides far more than a sketch of AB's

15  fraudulent design. On each element of the alleged fraud, Patagonia provides

16  significant detail.

17       • **False Representations:** Prior to filing the Statement of Use, AB consum-

18  mated the acquisition of the ITU in violation of Section 10(a) of the Lanham Act.

19  FAC ¶¶ 27, 29. The assignment occurred no later than May 2012 when AB's in-

20  house attorneys took control of the application. *Id.* at ¶ 91. Starting with the

21  Revocation of Attorney on May 14, 2012, AB not only misrepresented to the

22  PTO that its attorneys were prosecuting the ITU on Warsteiner's behalf, but also

23  concealed the fact that AB already had closed the acquisition, an omission that

24  itself constitutes a false statement. *Id.* at ¶¶ 23, 91; *see Caymus Vineyards v.*

25  *Caymus Med., Inc.*, No. 91204667, 2013 WL 6665451, at *4 (T.T.A.B. July 12,

26  2013) ("Deliberately omitting relevant information, as has been alleged by

27  applicant, may be treated as the equivalent of a false statement ….").

28       With AB's lawyers in charge, four days before the ITU was set to fall

1    abandoned for failure to use the mark, AB's attorney submitted a verified Statement

2    of Use, again on Warsteiner's supposed behalf.  FAC ¶ 24.  In addition to omitting

3    that the ITU had been assigned to AB, the verified Statement of Use falsely claimed,

4    expressly, that Warsteiner was "the owner of the mark sought to be registered."

5    FAC ¶¶ 27, 29; Req. for Judicial Notice ("RJN") Ex. A at 12.

6        The Statement of Use also falsely claimed that Warsteiner was using the

7    trademark in commerce on beer, when in fact Warsteiner already had assigned

8    away the ITU and any resulting trademark to AB.  FAC ¶ 25.  AB tries to evade this

9    allegation by asserting that Warsteiner affirmed only that it *or* its "related company,

10   licensee, or predecessors in interest" used the mark.  Motion at 8.  But, if the allega-

11   tions in the FAC are accepted as true, as required, any Statement of Use dependent

12   on Warsteiner's "license" would simply have been another species of fraud.

13   Warsteiner had no rights to "license" the mark after it had already assigned the ITU

14   to AB.  *Id.* at ¶ 27.  These allegations do more than "tend to exclude the possibility

15   that AB's alternative explanation [AB's conjecture about a license from Warsteiner

16   to AB] is true" (Motion at 8 & n. 5), which is more than sufficient.  Fraud would

17   be impossible to allege if a defendant could simply retort – without disclosing any

18   evidence or reasonable theory – that the allegedly fraudulent statements were true.

19       AB's subterfuge culminated in its filing of the assignment documents in

20   February 2013.  In those documents, AB made yet another false statement to the

21   PTO, misrepresenting the date of the assignment to convey that the transaction

22   occurred after the application had matured to registration when the opposite was

23   true.  *Id.* at ¶¶ 27-29, 91.

24       In short, AB's evasion of Section 10(a) required several specific false state-

25   ments, all readily discernible from the FAC, as well as AB's embedded omission

26   that Warsteriner had already assigned AB the application. AB's specter of a

27   "license" raises immediate inferences that it was a sham and – even if properly

28   considered – would not be sufficient to defeat Patagonia's pleadings of an unlawful

transfer. AB cannot benefit from its elaborate scheme to make the application appear proper on the surface, when it was unregistrable once AB had acquired it. *See Strome*, 2014 WL 6485533, at *5 (denying motion to dismiss fraud claim based on statements to PTO that applicant owned the mark, when purported acquisition came through "a backdated 'confirmation' of sale" from owner).

- **The False Representations Concerned Material Facts:**  Materiality turns on whether, but for the misrepresentation, the registration "either would not or should not have issued."  6 McCarthy on Trademarks and Unfair Competition § 31:67 (5th ed.).  Here, had the PTO known that the ITU was assigned to AB prior to the filing of the Statement of Use, the PTO would have deemed the application non-compliant with Section 10(a) and would not have issued the registration.  FAC ¶ 29.  AB crafted a series of filings to hide the timing of the assignment and the identity of the owner of the application and mark, material facts on which the PTO relies.  *Id.* at ¶¶ 25-29.  AB does not contend that the alleged misrepresentations are material and thus concedes that this element of fraud is alleged.

- **AB Knew of the Falsity When It Implemented the Scheme:**  AB "know-ingly" made its false misrepresentations.  AB's experienced attorneys were aware of the anti-trafficking rule embodied in Section 10(a).  FAC ¶¶ 11, 29.  Despite this knowledge, AB acquired the ITU in violation of Section 10(a) and then colluded with its competitor to conceal the timing of the transaction by misrepresenting to the PTO that Warsteiner had a continued interest in the application and that Warsteiner had made use of the mark.  *Id.*  AB, however, knew that these statements were untrue as it had entered into an agreement transferring the application prior to the filing of the Statement of Use.  *Id.* ¶¶ 27-28, 91; *SmileDirectClub, LLC v. Berkely*, No. SACV 18-1236 JVS (KESx), 2018 WL 8131096, at *7 (C.D. Cal. Oct. 26, 2018) (plausible inference of fraudulent state of mind arises where  the applicant knew an ITU application requires *bona fide* plans to use but filed the application without such plans).

- **The Deception Was Intentional:**  AB asserts that Patagonia's fraud claim is based on a negligence standard (mischaracterizing the discussions held by the parties' counsel prior to AB's filing of this motion).  Motion at 10-11; Gilchrist Declaration ¶ 6.  The FAC, however, alleges that AB's false representations were made with the intent to deceive the PTO into issuing the registration. FAC ¶¶ 29, 90. Nowhere in the pleading (or in the meet and confer response) does the phrase "should have known" appear.  *See generally* FAC.

The entire purpose of the fraudulent scheme was to conceal the fact that AB had acquired the ITU in violation of Section 10(a).  FAC ¶ 29.  Claiming Warsteiner's continued ownership, while withholding the fact that AB had acquired the ITU, raises an inference of intent to deceive.  *See Daimlerchrysler Corp. v. Am. Motors Corp.,* No. 92045099, 2010 WL 302022, at *3 (T.T.A.B. Mar. 25, 2010) ("[W]here a pleading asserts that a known misrepresentation, on a material matter, is made to procure a registration, the element of intent, indispensable to a fraud claim, has been sufficiently pled.").

Relying on *In re Bose*, 580 F.3d 1240 (Fed. Cir. 2009) (not a pleading case), AB conjures that the FAC does not allege "specifically who made" the false state-ments with an intent to deceive the PTO.  Motion at 10.  Initially, Patagonia identi-fied AB's publicly filed statements (the subject of AB's RJN) and these filings identify the AB lawyers who made the statements.  RJN Ex. A at 12-17.  Even so, courts after *In re Bose* have expressly rejected AB's arguments, holding that a plaintiff need not identify a specific individual that had fraudulent intent to assert fraud on the PTO.  *See Adidas Am., Inc. v. TRB Acquisitions LLC*, No. 3:15-cv-2113-SI, 2018 WL 4600291, at *1 (D. Or. Sept. 25, 2018).  This Court also has held that it is the applicant/registrant's intent that is relevant to a fraud-on-the-PTO claim, not the "individual signer's personal intent."  *Neurovision Med. Prods., Inc. v. Nuvasive, Inc.*, No. 09-CV-6988 R (JEMx), 2011 WL 13130775, at *1 (C.D. Cal. May 5, 2011)  The Board itself has stated that *In Re Bose* does not require that "a

party identify a 'specific individual' who 'knew of the withheld material information or of the falsity of the material misrepresentations, and withheld or misrepresented this information with a specific intent to deceive the PTO.'" *Meckatzer Lowenbrau Benedikt Weib KG v. White Gold, LLC*, No. 92051014, 2010 WL 1946273, at *3 (T.T.A.B. May 13, 2013).  By alleging why and how AB knowingly made false statements with the intent to deceive the PTO (FAC ¶¶ 29, 90, 92), Patagonia sufficiently has alleged the intent element of its fraud claim.

- **The False Representations Induced the PTO's Reliance:**  The PTO relied on AB's representations that Warsteiner maintained an interest in the application, that Warsteiner had commenced use of the mark, and that no assignment had occurred prior to the filing of the Statement of Use.  FAC ¶¶ 26, 92.  AB makes no argument to the contrary.

AB's reliance argument is confined to the assignment documents.  AB contends that the PTO could not have relied on the assignment documents because the assignment was filed after the registration was issued.  Again, AB deliberately ignores the premise of the FAC.  AB's recordation of the assignment *after* the registration had been issued was part of the scheme.  The PTO relied on the absence of a recorded assignment in determining that the mark was registrable.  If AB had been truthful about the date of the assignment – either by filing it when it acquired the ITU, or accurately dating the form as filed – the public record would have revealed that AB unlawfully obtained the application before the mark registered.  The PTO's reliance, in any event, on statements made during prosecution do not end once the registration is issued.  The PTO might, for example, cite a registration as blocking a later application on the assumption that the registration is valid as was represented.  *See, e.g.*, RJN Ex. B at 28.

## V.   CLAIM THREE FOR DILUTION IS SUFFICIENT.

AB's dilution arguments again attempt to decide Patagonia's claim on the

merits at the motion to dismiss stage, distorting the applicable pleading require-ments.  AB claims: (1) Patagonia has insufficiently pleaded that its PATAGONIA trademark is famous, (2) Patagonia's PATAGONIA word mark is somehow disqualified from fame status, because it lacks an undefined "requisite level of distinctiveness," and (3) Patagonia's dilution claim is too vague to answer.  Motion at 18-24.  Each argument fails.[5]

### A. The FAC Contains Sufficient Factual Allegations to Show the "Fame" Element of a Dilution Claim.

Four non-exclusive factors determine fame for purposes of a dilution claim: (i) duration, extent, and geographic reach of advertising and publicity; (ii) volume and extent of sales; (iii) actual recognition of the mark; and (iv) whether the mark is registered.  15 U.S.C. § 1125(c)(2)(A)(i)-(iv).  To plead fame, Patagonia merely must allege facts to support a plausible theory of its notoriety.  *See In re Gilead Scis. Secs. Litig.*, 536 F. 3d 1049, 1057 (9th Cir. 2008); *Blue Sphere, Inc. v. Swift*, No. SACV 14-00782-CJC(DFMx), 2014 WL 12575768, at *2 (C.D. Cal. Sept. 17, 2014) (denying motion to dismiss based on allegations that "Lucky 13 has marketed and sold its goods internationally, generating millions of dollars per year in sales and building significant consumer goodwill"); *Cree, Inc. v. Fastbuy, Inc.*, No. CV 18-01802-CJC(ASx), 2018 WL 4850404, at * 5 (C.D. Cal. July 16, 2018) (denying motion based on allegations that plaintiff is "a market leader in the world of LED products" and that defendant's intentional copying confirms the CREE and XM-L marks are "famous and distinctive").

The facts relating to each of these factors, including the following examples,

---

[5] Patagonia also asserts infringement, dilution and unfair competition under California Law (Claim 4).  The substance of Patagonia's state law claims puts AB on notice (AB does not say otherwise), and to the extent Patagonia cited obsolete statutory numbers, it offered to clarify in discovery or file a simple post-Motion amendment.  As AB did not respond and persisted in its Motion on these claims, Patagonia will oppose.  There is no basis to dismiss the claims and any questions about what statutes are relied upon can easily be cured in discovery.

are sufficient to show fame:

- **Advertising and Publicity:** (1) Patagonia's brand has appeared on millions of PATAGONIA branded products, sold over the course of decades (FAC at ¶ 3); (2) for many years, Patagonia has spent enormous amounts of time, money and effort advertising and promoting its brand (*id.* at ¶ 40); (3) "PATAGONIA brand products are advertised in print and on the Internet" and "advertised and promoted and presented at point of sale by numerous retailers" (*id.*).

- **Sales:** (1) "[S]ince 1985, Patagonia has pledged 1% of sales to environmental groups … donating more than $100 million to date" (translating to at least several billion dollars in sales, just since 1985) (*id.* ¶ at 9); (2) Patagonia made $10,000,000 in sales in a single day (the proceeds going to charity) (*id.*); (3) "Plaintiffs have sold their PATAGONIA brand products all over the world, including throughout the United States and California" (*id.* at ¶ 41).

- **Recognition:** (1) The PATAGONIA mark "enjoys strong consumer recognition, is used as a household term to refer to Patagonia or its products, and is recognized around the world and throughout the United States by consumers" (*id.* at ¶ 43); (2) "In the more than forty years since Patagonia, Inc.'s business started, the PATAGONIA brand and its P-6 logo have become among the most identifiable brands in the world" (*id.* at ¶ 8); (3) Patagonia, Inc.'s founder launched 1% For the Planet in 2002 – a non-profit with 1,200 members that have donated more than $150 million (*id.* at ¶ 9); (4) Patagonia, Inc. became one of California's first Benefit Corporations in 2012 (*id.*).

- **Registration:** "Patagonia owns numerous registrations for and including the PATAGONIA trademark and P-6 logo," (table of Plaintiffs' registrations follows). *Id.* at ¶ 36.

AB's deliberate copying of the PATAGONIA brand also support Patagonia's pleading that its mark is recognized, famous, and valuable. *Cree, Inc.*, 2018 WL 4850404, at * 5. For example, "AB has dressed its sales people in down jackets and

1    given out beanies, t-shirts, and scarves bearing AB's PATAGONIA logo—all

2    products that Patagonia sells," and "AB has launched its copycat brand at ski resorts

3    where Patagonia, Inc.'s ski apparel is widely used and universally recognized in

4    further attempts to draft off Patagonia's goodwill."  FAC at ¶ 3.  AB's efforts to

5    connect its beer to environmental conservation have the same effect.  *Id*.

### B.    AB's Authorities Regarding Dilution Are Overblown, Distinguishable, or Irrelevant to the Pleading Stage.

8    None of AB's cases supports the conclusion (1) that broad categories of marks

9    are foreclosed from being famous, or (2) that the Lanham Act requires pleading of

10   "quantifiable metrics" for the fame factors.  Motion at 15.

11   AB begins by mischaracterizing *Fruit of the Loom, Inc. v. Girouard,* 994 F.2d

12   1359, 1362-63 (9th Cir. 1993).  The case has nothing to do with pleading require-

13   ments – it is an appeal from a *judgment following a bench trial* – but is nevertheless

14   incorrectly cited by AB as support for the statement that "Courts grant motions to

15   dismiss dilution claims where the complaint lacks sufficient facts to support a claim

16   of fame."  Motion at 19.  AB also misuses *Fruit of the Loom* to say that Patagonia's

17   mark lacks sufficient strength to qualify for dilution protection.  AB selectively

18   ignores that the Ninth Circuit recognized that FRUIT OF THE LOOM indisputably

19   is "a famous American trademark."  The court simply affirmed the district court's

20   verdict that "Fruit" alone was not famous, agreeing that "Fruit" alone was at best

21   an "embryonic" mark and not comparable to FRUIT OF THE LOOM.  *Id.*  This

22   decision does not inform how this Court should treat Patagonia's decades-old

23   famous brand (FAC ¶ 7) – on a pleading motion.

24   AB's reliance on *MGA Entm't, Inc. v. Dynacraft BSC, Inc.*, No. 2:17-cv-

25   08222-ODW-KS, 2018 WL 2448123, at *6 (C.D. Cal. May 30, 2018) fails for a

26   similar reason.  *MGA* involved product configuration trade dress (not asserted by

27   Patagonia in the FAC), a species of trademark that has special burdens even to attain

28   secondary associations as an indicator of origin.  *See Wal-Mart Stores, Inc. v.*

*Samara Bros., Inc.*, 529 U.S. 205, 213 (2000).  Product configuration trade dress for a children's "car" can only be communicated visually and appeals to a niche consumer segment.  It cannot compare to Patagonia's brand and identity which is far more susceptible to becoming a "household" name.  In any event, it is not worth hair splitting over *MGA's* analysis:  MGA was granted leave to amend to add that the trade dress was known among the "general public."  *MGA*, 2018 WL 2448123, at *6.  Patagonia already has pleaded (with support) that its brand is a national household name.  FAC ¶ 43.

The remaining cases that AB cites are either facially absurd (*Aegis, Theta Chi*) or unquestionably conclusory (*Planet Coffee Roasters*, *T-4 Corp., ANT, Dahon*).  In *Aegis Software, Inc. v. 22nd Dist. Agric. Ass'n,* 255 F. Supp. 3d 1005, 1010-11 (S.D. Cal. 2017), the court dismissed a dilution claim after the plaintiff alleged that "San Diego Spirits Festival" was famous because 3,800 attended the event at its height of popularity in 2014 (95% were from San Diego).  This compares unfavorably to sales of millions of units; charitable donations as a function of billions of dollars in sales; a single day exceeding $10 million in sales; and a mark that is a household name nationwide.  AB relies on *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 824 (N.D. Cal. 2016) as support for the idea that allegations of philanthropy cannot support fame.  In *Theta Chi*, the dismissal was based in part on the fraternity's allegations that it had only 175,000 members over 160 years, and that its chapter left Stanford (the defendant) in 1988 due to a lack of membership.  *Id.* at 828.  The decision hardly addresses Patagonia's allegations regarding its philanthropy – e.g. "donating more than $100 million to date" (FAC ¶ 9) – much less Patagonia's other specific allegations supporting fame.

The *Planet Coffee Roasters, T-4 Corp., ANT,* and *Dahon* courts dismissed similar claims because the plaintiffs said *nothing* beyond that their respective marks – Planet Coffee, ♥'n, ANT, DAHON, and the "obscure" BIOLOGIC and ECOLOGIC marks – are famous.  *Planet Coffee Roasters, Inc. v. Dam*, No. SACV

09-00571-MLG, 2009 WL 2486457, at *3 (C.D. Cal. Aug. 12, 2009); *T-4 Corp. v. McDonald's Corp.,* No. CV 17-08-M-DLC, 2017 WL 3037422, at *5-6 (D. Mont. July 17, 2017); *ANT v. McPartlin*, No. CV 11-6975 PSG (Ex), 2012 WL 13012472, at *7 (C.D. Cal. May 30, 2012); *Dahon N. Am., Inc. v. Hon*, No. 2-11-cv-05835-ODW (JCGx), 2012 WL 1413681, at *9 (C.D. Cal. Apr. 24, 2012).[6]  None of these decisions is relevant to Patagonia's detailed pleading.

### C.   The PATAGONIA Mark Is Sufficiently Distinctive to Support a Claim of Fame.

AB also argues that Patagonia's mark lacks inherent strength, and is therefore precluded from being famous.  *See* Motion at 23. There is no legal support for this argument. AB presumes that a trademark must be inherently strong to be famous, then announces that other "independent significance" of the Patagonia term precludes Patagonia from establishing fame.  If AB's argument is that only fanciful trademarks can be famous – i.e., a term with other meanings cannot be a famous mark – it is mistaken.  *Nat'l Pork Bd. & Nat'l Pork Producers Council v. Supreme Lobster & Seafood Co.,* No. 91166701, 2010 WL 2513872 (T.T.A.B. June 11, 2010) (THE OTHER WHITE MEAT is famous); *Mattel Inc. v. Scott*, No. 91123052, 2006 WL 3472709 (T.T.A.B. Nov. 21, 2006) (HOT WHEELS is famous); *Delta Air Lines, Inc. v. Influence Direct, LLC*, No. 3-14-0926, 2016 WL 310068, at *5 (M.D. Tenn. Jan. 15, 2016) (DELTA is famous); *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 643 (N.D. Tex. 2009) (AMERICA'S TEAM is famous).  AB's cases calling "Budweiser" a famous mark serve themselves to foreclose any argument that a mark having geographical

---

[6] There is no authority that, at the pleading stage or any other stage, a court may rely solely on anecdotal notoriety or its own brand affinities to resolve the issue of fame *See, e.g., In-N-Out Burgers v. Smashburger IP Holder LLC*, No. 8:17-cv-1474-JLS-DFM, 2017 WL 10402610, at *3 (C.D. Cal., Dec. 21, 2017) (denying motion to dismiss dilution claim because In-N-Out "need not *prove* that the Double Double mark is on par with a brand like Budweiser; it must 'plead the elements of a dilution claim sufficient to set forth a claim for relief.'" (emphasis in original; internal citation omitted)).

1   connotations cannot be famous.  Its own Budweiser mark – derived from the Czech

2   city of Budějovice (or "Budweis" in German), where beer has been brewed since the

3   13th century – has identical geographic origins as Patagonia.

4        AB gains no ground by pointing to "eleven current registrations *including*

5   the word Patagonia."  *See* Motion at 24 (emphasis added).  The mere existence of

6   registrations, if judicial notice of them were proper, says nothing about the commer-

7   cial impact of those purported marks.[7]  And, if AB's theory were correct, APPLE

8   and AMAZON (both with alternate significance) would be disqualified as well –

9   a doubtful and non-credible prospect.

10       AB relies on *Avery Dennison Corp. v. Sumpton*, 189 F. 3d 868 (9th Cir.

11  1999).  But, once again, *Avery* is not a pleading case.  The district court had granted

12  summary judgment *in favor* of Avery Dennison on its dilution claim, before the

13  Ninth Circuit reversed and entered summary judgment against it.  Significantly, the

14  decision actually recognizes that marks which are not inherently distinctive – if they

15  "acquire" distinctiveness – can be famous.  189 F.3d at 877 ("No dispute exists that

16  'Avery' and 'Dennison' are common surnames ….  Avery Dennison cannot claim

17  that 'Avery' and 'Dennison' are inherently distinctive, but must demonstrate

18  acquired distinctiveness through secondary meaning.").  The defect in Avery

19  Dennison's dilution claim was that its showing went "no further" than demon-

20  strating acquired distinctiveness.  *Id.* at 879.  No doubt Avery's reliance on surveys

21  of its own customers – all already familiar with its brand of office supply products

22  (hardly as likely to become "famous" as a consumer brand) – contributed greatly to

23  the entry of summary judgment against its claims.  *Id*. at 879 ("The one consumer

24  group that did not necessarily include office supply purchasers for businesses was

25  still required to be 'somewhat' or 'very' familiar with Avery products in order to be

26

27  _____

    [7] Patagonia objects to taking judicial notice of third party registrations which,
    standing alone, are irrelevant.  E.g. *Boldface Licensing + Branding v. By Lee Tillett,*
28  *Inc.*, 940 F. Supp. 2d 1178, 1191 (C.D. Cal. 2013).

counted."). AB's argument that the Court can summarily reject Patagonia's dilution claim without determining the "precise level of strength" enjoyed by the brand (Motion at 24) is unsupported and contradicted to the extent *Avery* says anything at all about pleadings. Patagonia must be afforded the opportunity to submit its own surveys and demonstrate its own renown before its claim may be judged.

### D. AB's Motion for a More Definite Statement of Claim Three Is Baseless and Should Be Denied.

AB claims it is unclear from the FAC which trademark Patagonia alleges is famous, who owns the famous trademark, or when the trademark became famous. *Id.* at 24. A Rule 12(e) motion permits the Court to grant relief when the pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). AB cites no authority in support of its request, and none exists because the FAC provides ample clarity for AB to respond.

The FAC states that it is the "PATAGONIA *word* mark" that is famous. FAC ¶ 67. It alleges that "AB's conduct is likely to cause dilution of Patagonia's PATAGONIA word mark." *Id.* at ¶ 68. The FAC lists registrations for the Patagonia word mark, which are obvious in that they show the word "PATAGONIA" in the supplied chart, rather than, e.g., "PATAGONIA PROVISIONS," or Patagonia's P-6 logo. *Id.* at ¶ 36. The same chart shows which registrations are owned by Provisions as opposed to Patagonia, Inc. Patagonia further alleges that its PATAGONIA word mark became famous "long before AB began selling PATAGONIA beer in the United States." *Id.* at ¶ 43. There is no requirement that Patagonia plead a specific date and time when the mark became famous, and AB provides no authority for one. No further definition is necessary.

## VI. CLAIM SIX ADEQUATELY PLEADS FALSE SUGGESTION OF CONNECTION.

The facts showing fame also assist in showing that Patagonia adequately has pleaded its claim that AB's registrations falsely suggest a connection with Patagonia

1   under 15 U.S.C. § 1052(a) ("Section 2(a)").  A false suggestion claim requires that:

2   (1) Defendant's PATAGONIA mark was the same or a close approximation of

3   Patagonia's identity; (2) Defendant's PATAGONIA mark when used on beer would

4   point uniquely and unmistakably to Patagonia; (3) Patagonia was not connected with

5   Defendant's PATAGONIA mark; and (4) Patagonia's reputation was sufficiently

6   strong that its connection with Defendant's PATAGONIA mark would be pre-

7   sumed.  *See Buffett v. Chi-Chi's, Inc.*, 1985 WL 73060, at *3  (T.T.A.B. June 13,

8   1985).  Like fame for purposes of dilution, these are empirical propositions,

9   plausibly raised by the allegations, and are not appropriately answered by pleading

10   motions.

11        AB does not cite any pleading cases that address Patagonia's Section 2(a)

12   claim, let alone that support dismissal of Patagonia's claim without leave to amend.[8]

13   AB argues that Patagonia "generally allege[s] 'extensive sales, publicity, awards

14   and leadership,' none of which is tethered to AB's date of *filing* or registration"

15   (momentarily losing sight of its own argument that the registration date is what

16   matters).  Motion at 13.  The characterization is disingenuous, ignoring allegations

17   that encompass Patagonia's pre-2012 actions, including about Patagonia's decades

18

---

19   [8] The statutory text resolves any doubt caused by AB's inexplicable comments that
20   it could not find a case in which an incontestable registration was cancelled based
     on 1052(a).  Among the other grounds for cancelling an incontestable registration,
     15 U.S.C. § 1064(3) permits cancellation "[*a[t] any time* if the … registration was
21   obtained fraudulently or contrary to the provisions of section 1054 of this title or of
     subsections (a), (b), or (c) of section 1052." (emphasis added).  It is hard to accept
22   AB's confusion about this point after Patagonia – at AB's request during the meet
     and confer – forwarded a case in which the TTAB cancelled an incontestable
23   registration for "BAMA" on the strength of the association between BAMA and the
     University of Alabama.  *Bd. Of Tr. of the Univ. of Alabama v. BAMA-Werke Curt*
24   *Baumann*, No. 13,291, 1986 WL 83709 (T.T.A.B. Aug. 6, 1986).  There is no
     question that 1052(a) is available to Patagonia to secure cancellation of AB's
25   campaign to associate itself with Patagonia – regardless of whether the registration
     is incontestable.  *See also Red Diamond Co. dba Nat'l Sportswear v. Nat'l*
26   *Sportswear, Inc.*, No. 92064690, 2017 WL 1476300, at *3 (T.T.A.B. Mar. 23, 2017)
     (citing Trademark Act Section 15) ("[T]he fact that a registration has become
27   incontestable does not preclude cancellation of that registration under claims that
     may be brought at any time under Trademark Act Section 14(3), 15 U.S.C. §
28   1064(3).").

of enormous charitable donations (FAC at ¶ 9); the 2002 launch of 1% for the

Planet, now representing 1,200 members (*id.*); decades of sales of millions of

PATAGONIA branded products (*id.* at ¶ 3); decades spent advertising and promot-

ing its brand (*id.* at ¶ 40); and Provisions' launch in 2012 to expand the offerings

under the PATAGONIA brand, aimed at addressing failures in the food supply

chain (*id.* at ¶ 4).[9]  These allegations go well beyond what is required.  *Petróleos*

*Mexicanos v. Intermix S.A.,* No. 92052292*, 2010 WL 5574284, *3 (T.T.A.B. Dec.

28, 2010) (Plaintiff met its burden by alleging that PEMEX is famous and had been

used "for decades," the registrant's PEMEX mark is identical to plaintiff's identity,

and the registrant's mark "falsely suggests a connection.").

Overlooking these simple requirements, AB calls Patagonia's pleading of

association "conclusory," ignoring allegations that (1) association actually has

occurred (e.g., "Consumers have … attributed AB's PATAGONIA beer to

Plaintiffs" (FAC at ¶ 54)); and (2) AB has intended all along to provoke such

associations (e.g., "AB has done everything possible to make it appear as though

this PATAGONIA beer is sold by Patagonia" (*id.* at ¶ 3) and "There is no question

that AB at all times was well aware of Patagonia's prior rights, or that it is now

using [an] array of promotional tools to try to capture Patagonia's … corporate

identity for itself" (*id.* at ¶ 52)).  If it were implausible for the public to recognize

a "Patagonia" entity, AB would not have started using the term as a noun and "dba,"

referring to itself as "Patagonia" or "Patagonia Cerveceria."  *Id*. at ¶¶ 12 and 49.

AB argues that Provisions (in attempting to overcome AB's purported beer

registration when applying for PATAGONIA PROVISIONS for wine) told the PTO

---

[9] The fame and reputational elements of 1052(a) are not equivalent to the nation-wide fame required for a dilution claim.  When AB conflates the "allegations of fame as of 2012" with allegations of fame for purposes of dilution (*see* Motion at 14,), AB misunderstands the requirements for a 1052(a) claim.  *See, e.g., Ass'n Pour La Def. et La Promotion De Loeuvre De Marc Chagall Dite Comite Marc Chagall v. Bondarchuk,* No. 92042323, 2007 WL 749714 (T.T.A.B. Mar. 8, 2007) (rejecting the registrant's argument that the "strict fame requirement" applied in dilution cases under 1125(c) also governs 1052(a) claims).

1   that PATAGONIA was no more "inherently" distinctive than PROVISIONS when

2   used in the mark.  AB omits that Patagonia's *next sentence* explains that: "To the

3   extent that PATAGONIA contributes more to the strength of the overall mark, it is

4   because the mark is already strongly associated with Patagonia, not because the term

5   PROVISIONS in Patagonia's new brand is not a distinctive element."  RJN at Ex. B,

6   57-58.  Patagonia also states that PATAGONIA "has become a famous lifestyle

7   brand."  *Id*. at 39.  That PATAGONIA PROVISIONS (when used on wine) can be

8   differentiated from AB's beer mark serves only as a reminder that AB has no such

9   defense under Section 2(a) to copying (identically) Patagonia's identity.

10          AB next claims that the existence of the Patagonia region somehow precludes

11   Patagonia's Section 2(a) claim.  AB's own cases show there is no requirement that

12   Patagonia must make exclusive use of the term "Patagonia" to succeed on its claim

13   (let alone to plead it).  In *Lesley Hornby a/k/a Lesley Lawson a/k/a Twiggy v. Tjx

14   Cos., Inc.*, No. 92044369, 2008 WL 1808555, at *16 (T.T.A.B. Mar. 4, 2008), the

15   TTAB rejected a similar argument that Section 2(a) was unavailable to the model

16   and actress Twiggy because others used the term.  The Board explained, "[t]he

17   requirement that a [registrant's] mark point 'uniquely' to [plaintiff] does not mean

18   that TWIGGY must be a unique term.  Rather, in the context of the [registrant's]

19   goods, we must determine whether consumers would view the mark as pointing only

20   to [plaintiff]."  Similarly, in *New York Yankees P'ship v. Evil Enters., Inc.*, No.

21   91192764, 2013 WL 1305332, at *2 (T.T.A.B. Feb. 8, 2013), the Board recognized

22   that "Evil Empire" originated with the Star Wars franchise but still granted the

23   Yankees relief under Section 2(a).  Patagonia's allegations do not lose plausibility

24   because, in other contexts, "Patagonia" might refer to a region.  Patagonia has met

25   its burden by alleging that AB's beer registration would point consumers to

26   Patagonia.

27          Third-party registrations do not help AB either.  "[T]hird-party registrations

28   and applications are not evidence that the marks which are the subjects thereof are

1   in use and that the public is familiar with the use of those marks," and therefore their

2   existence has no bearing on the type of awareness-focused question that is central to

3   a Section 2(a) claim and analysis. *Lesley Hornby*, 2008 WL 1808555, at *16

4   (quoting *In Re White*, No. 78146926, 2006 WL2049628 (T.T.A.B. Jan. 4, 2006));

5   *accord Boldface Licensing + Branding*, 940 F. Supp. 2d at 1191. AB will have an

6   opportunity to show that PATAGONIA tires and berries are important consumer

7   brands, but for now those registrations have no bearing on Patagonia's claim under

8   Section 2(a).

9        AB also overlooks AB's intent. As the Federal Circuit pointed out in *Univ. of*

10  *Notre Dame du Lac v. J.C. Food Imps. Co.*, 703 F.2d 1372 (Fed. Cir. 1983),

11  evidence that the applicant intended to cause an association with the university

12  would overcome others' use of the term. "The defense that the result intended was

13  not achieved would be hollow indeed." *Univ. of Notre Dame*, 703 F.2d at 1377.

14  AB intended to associate its beer with the Patagonia brand (and has succeeded).

15  *See, e.g.,* FAC ¶¶ 3, 52.

16       Finally, Patagonia's allegations of a false association meet the timing

17  requirements of a Section 2(a) claim, namely that AB's purported PATAGONIA

18  mark on beer triggered a false association as of the registration date: "As a result

19  of the fame and reputation of Patagonia, Inc.'s identity and name – *including at the*

20  *time that Registration No. 4,226,102 issued* – consumers are *and were* likely imme-

21  diately to associate AB's use of Patagonia on beer with Patagonia, Inc." FAC, ¶ 87.

22  Also, "the term PATAGONIA uniquely and unmistakably identifies Patagonia

23  Inc. … since well before the PTO issued U.S. Trademark Registration

24  No. 4,226,102." FAC, ¶ 42. These allegations – particularly when considered

25  together with Patagonia's factual support of its reputation – satisfy the pleading

26  requirement. AB offers no support for the proposition (Motion at 14) that calling

27  attention to AB's ongoing and deliberate maintenance of a false association – which

28  AB characterizes as "comingled dates" – renders the pleading inadequate.

1     **VII.   THE FIFTH CLAIM PROPERLY PLEADS ABANDONMENT.**

2        A mark is abandoned "[w]hen its use has been discontinued with intent not to

3 resume such use." 15 U.S.C. § 1127. Three years of nonuse shall be prima facie

4 evidence of abandonment. *Id.* To plead the claim, Patagonia must allege (1)

5 discontinuance of use and (2) intent not to resume such use, with both requirements

6 subject to the inferences and definitions set out in the statute. *Mophie, Inc. v. ABM*

7 *Wireless, Inc.*, No. SACV 14-1422-JLS (RNBx), 2015 WL 12791374, at *3 (C.D.

8 Cal. May 19, 2015) (citing *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.,*

9 *458 F.3d 931, 935 (9th Cir. 2006)).*

10        "AB made no *bona fide* commercial use of the mark in the United States until

11 its recent campaign."[10] FAC at ¶ 30. AB's press releases and public filings from

12 2012 through 2018, when mentioning the brand at all, confine PATAGONIA beer

13 to the "Latin America South" category until finally stating, in February 2019, that

14 AB was "identifying opportunities to introduce existing brands [such as Argentina's

15 Patagonia] into new markets." *Id.* at ¶ 32, 35. Nothing indicates that AB had any

16 plans to develop a Patagonia brand in the United States. *See La Societe Anonyme*

17 *des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1272-73 (2d Cir. 1974)

18 (minimal sales were designed to maintain the trademark right and were inconsistent

19 with commercial exploitation). Further, a party who has abandoned its trademark

20 rights cannot revive those rights by resumed use. *Cerveceria Centroamericana, S.A.*

21 *v. Cerveceria India, Inc.,* 892 F.2d 1021, 1027 (Fed. Cir. 1989) (incontestable

22 registration cancelled following meager use over the period of six years, followed

23 by resumed use one year prior to the cancellation action). Accordingly, AB's failure

24 to use the mark during the six years between the date of registration and its recent

25

26     _____

27 [10] Patagonia also alleges Warsteiner and AB failed to use the PATAGONIA mark during critical periods. The FAC alleges that, if Warsteiner acquired any trademark rights pursuant to some kind of license (as AB hints), but the transfer to AB was

28 illegal, then there is no question that Warsteiner has abandoned the mark and registration. FAC, ¶ 82.

1   brand launch means that AB's abandonment is plausible.[11]

2        There is also no basis for dismissing Patagonia's abandonment claim because

3   Patagonia did not (except by using the term "abandonment") recite the boilerplate

4   that AB or Warsteiner lacked an "intent to resume use."  As courts recognize –

5   including AB's authority – abandonment is properly pleaded with "facts from

6   which this intent could reasonably be inferred."  *Bell v. Harley-Davidson Motor Co.*,

7   No. 05cv2151-L(BLM), 2007 WL 935588, at *3 (S.D. Cal. Mar. 6, 2007); *see also*

8   *Mophie*, 2015 WL 12791374, at *3 (allegation of non-use "is sufficient to allege

9   intent not to resume use").  The FAC alleges the requisite long periods of non-use.

10  *See, e.g.*, FAC at ¶¶ 25, 30, 32

11  **VIII.  CONCLUSION**

12       Under the Court's standing order, the Motion never should have been brought

13  and now should be denied.

14

15  Dated:  July 25, 2019            Respectfully submitted,

16                                  KILPATRICK TOWNSEND & STOCKTON LLP

17

18                                  By:  _____/s/ *Gregory S. Gilchrist*_____

19                                           Gregory S. Gilchrist

20                                  Attorneys for Plaintiffs
                                PATAGONIA, INC. and

21                                  PATAGONIA PROVISIONS, INC.

22

23

24

25

26

_____

27  [11] AB insinuates that Patagonia took too long to challenge AB's registration to
no apparent point in the Motion.  But Patagonia had no incentive to challenge a
behemoth's registration when AB was not using the mark and it appeared the mark

28  would expire on its own as a result of AB's non-use.