**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Patagonia, Inc. et al.,

   Plaintiffs,

   v.

Anheuser-Busch, LLC,

   Defendant

2:19-cv-02702-VAP-JEMx

**Order GRANTING IN PART Plaintiff's Motion for Partial Summary Judgment (Dkt. 235) and DENYING Defendant's Motion for Partial Summary Judgment (Dkt. 244)**

Before the Court are Patagonia, Inc. and Patagonia Provision's, Inc.'s ("Patagonia") Motion for Partial Summary Judgment ("Patagonia MSJ," Dkt. 235) and Anheuser-Busch, LLC's ("AB") Motion for Partial Summary Judgment ("AB MSJ," Dkt. 244).  The parties each opposed the other's motion.  (Dkts. 249, 257).

After considering all papers filed in support of, and in opposition to, the Motion, the Court deems this matter appropriate for resolution without a hearing.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  The Court GRANTS Patagonia's Motion for Partial Summary Judgment IN PART and DENIES AB'S Motion for Partial Summary Judgment.

# I. BACKGROUND

This action arises out of a trademark dispute between Patagonia and AB regarding use of the PATAGONIA mark.  The parties are familiar with the facts of this case and the Court reviews them only briefly here.  Patagonia, Inc. is a California corporation that designs, develops, markets and retails outdoor apparel, sportswear and related products.  (Third Amended Complaint, "TAC," Dkt. 100 ¶ 6).  Patagonia, Inc. has used its PATAGONIA mark (Registration No. 1,189,402) and its P-6 logo (Registration No. 1,294,523) in interstate commerce since as early as August 1974.  (*Id.* ¶¶ 7, 8, 36).

Plaintiffs allege that their PATAGONIA brand and P-6 logo have become among the most identifiable brands in the world.  (*Id.* ¶ 8).  In 2012, Plaintiff Patagonia Provisions, Inc., a related company, began developing, marketing and selling socially and environmentally responsible food items under the PATAGONIA PROVISIONS® mark (Registration No. 4,168,329), including beer, buffalo jerky, salmon, fruit and almond bars, and soup mixes. (*Id.* ¶¶ 10, 36).

Defendant Anheuser-Busch is a global producer of beer and other products and services under a multitude of brands.  (*Id.* ¶ 11).  Among its brands is Anheuser-Busch's PATAGONIA beer, which it sells under the business name Patagonia Brewing Company.  (*Id.* ¶¶ 11-12).  Anheuser-Busch purports to own the registered trademark PATAGONIA (Registration No. 4,226,102) for use in connection with beer.  (*Id.* ¶ 16).

United States District Court
Central District of California

1   Plaintiffs allege that Anheuser-Busch, in launching its PATAGONIA

2   beer, has deliberately misappropriated the goodwill that Plaintiffs have

3   cultivated in their PATAGONIA brand.  (*Id.* ¶ 3).  Plaintiffs allege that

4   Anheuser-Busch has created a logo that is strikingly similar to Patagonia,

5   Inc.'s P-6 logo.  (*Id.*).  Plaintiffs further allege that Anheuser-Busch's

6   environmental conservation initiative is a clear attempt to copy Plaintiffs'

7   famous brand identity.  (*Id.*).  Additionally, Plaintiffs allege that Anheuser-

8   Busch's PATAGONIA registration was procured unlawfully and through

9   fraudulent misrepresentations to the United States Patent and Trademark

10  Office ("USPTO").  (*Id.* ¶ 16).

11

12  Each party now moves for partial summary judgment.  Patagonia seeks

13  summary judgment on its Fifth and Ninth claims, cancellation of trademark

14  registration and rectification of trademark registration pursuant to 15 U.S.C.

15  § 1119.  (Dkt. 235 at 14; TAC at 12-14).  AB, in its Motion, seeks summary

16  judgment on Patagonia's Fifth, Sixth, Seventh, and Eighth Claims for

17  cancellation of trademark registration pursuant to 15 U.S.C. § 1119,

18  1502(a), and 1064(3), (Dkt. 244 at 1-2; TAC at 12-14); its own timing

19  affirmative defenses; and AB's Third Counterclaim for declaratory judgment

20  that AB owns the trademark registration for PATAGONIA on beer

21  (Registration No. 4,226,102), (Dkt. 244 at 2; Dkt. 108 at 25).

22

23  **II.    LEGAL STANDARD**

24  A motion for summary judgment or partial summary judgment shall be

25  granted when there is no genuine issue as to any material fact and the

26

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotations and citation omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  Id. (quoting Wright, et al., Federal Practice and Procedure § 2720, at 335–36 (3d ed. 1998)).  If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (reconciling *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  The nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts" but must show specific facts which raise a genuine issue for

United States District Court
Central District of California

United States District Court
Central District of California

trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

At the summary judgment stage, a district court should "focus on the admissibility of the [evidence's] contents" and not the form in which the evidence is presented—it is sufficient that a party will be able to produce evidence in its admissible form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).  Moreover, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and thus need not be considered on a motion for summary judgment.  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).

### III.    FACTS

Both Patagonia and AB have filed statements of undisputed facts, ("Patagonia SUF," Dkt. 235-1; "AB SUF," Dkt. 244-1), to which the other

party has filed statements of genuine dispute and additional facts, ("AB RSUF," Dkt. 254-2, "Patagonia RSUF," Dkt. 291-1).  Each party has also filed various evidentiary objections to facts cited in the other's papers.

To the extent certain facts or contentions are not mentioned in this Order, the Court has not found it necessary to consider them in reaching its decision.  In addition to considering the evidentiary objections raised by the parties, the Court has reviewed independently the admissibility of the evidence that both parties submitted and has not considered evidence that is irrelevant or inadmissible.  At the summary judgment stage, a district court should "focus on the admissibility of the [evidence's] contents" and not the form in which the evidence is presented—it is sufficient that a party will be able to produce evidence in its admissible form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).  Moreover, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and thus need not be considered on a motion for summary judgment.  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).

**A.  Undisputed Facts**

Local Rule 56 allows the Court to find that "the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Issues" *and* (b) controverted by declaration or

United States District Court
Central District of California

other written evidence filed in opposition to the motion."  Local Rule 56–3 (emphasis added).

General

Patagonia, Inc. designs and sells outdoor apparel, sportswear, and related products.  (AB SUF 142).  Patagonia Provisions, Inc. is a related company founded in 2012 that offers various food items, such as buffalo jerky and soups.  (AB SUF 144).  Patagonia, Inc. was named after the famous Patagonia region in South America that inspired its founders.  (AB SUF 145).   Patagonia, Inc.'s label is inspired by a silhouette of the peaks of the Mt. Fitz Roy skyline, located in the Patagonia region in South America. (AB SUF 146).

ITU and Assignment of Mark

Warsteiner Importers Agency, Inc. ("WIA" or "Warsteiner") filed an intent-to-use application to Register PATAGONIA for beer on June 8, 2006, based on its plan to sell beer in the United States imported from its brewery in Argentina.  (Patagonia SUF 1; AB SUF 4).  On July 4, 2007, the United States Patent and Trademark Office ("PTO") issued a Notice of Publication Under 12(a) regarding the PATAGONIA Application, which stated, in part: "The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the Official Gazette on the date indicated above [July 24, 2007] for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or

7

United States District Court
Central District of California

by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of

Patents and Trademarks may issue a notice of allowance pursuant to

section 13(b) of the Statute."  Plaintiffs did not file an opposition to the

PATAGONIA Application.  (AB SUF 8).

Statement of Use

Warsteiner asked for several extensions of time to file its Statement of

Use ("SOU").  On January 12, 2011, Warsteiner filed a request for a six (6)

month extension of time to file its SOU.  (Patagonia SUF 9).  In its May 31,

2011 extension request, Warsteiner stated, in part, that it had a "continued

bona fide intention, and is entitled, to use the mark in commerce on or in

connection with" beer.  (AB SUF 17).  The extension request also stated that

"[a]fter WIN [Warsteiner International KG] sold the Brewery in 2010

Warsteiner no longer planned to import and sell beer in the US using the

Patagonia trademark."  (Patagonia RSUF 17).

In an email of November 24, 2011, AB requested that Warsteiner extend

the deadline to file a SOU once more, explaining that "[t]he only additional

requirement from [AB] is that Warsteiner agrees to extend the trademark

application from January 2012 until mid-2012 . . . because otherwise AB

would not have enough time to complete the required steps."  (Patagonia

SUF 42).  Warsteiner filed its final request for an extension of time on

January 5, 2012, setting the deadline on July 21, 2012.  (Patagonia SUF

44).

On July 17, 2012, AB filed a SOU with the PTO in connection with Warsteiner's PATAGONIA Application.  (AB SUF 58).  The SOU stated that "The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 07/16/2012, and first used in commerce at least as early as 07/16/2012, and is now in use in such commerce."  (AB SUF 59).  On September 8, 2012, the PTO issued a Notice of Acceptance of Statement of Use, (AB SUF 65), and on October 16, 2012, the USPTO issued the trademark registration for the PATAGONIA Application, Registration No. 4,226,102 (the "Registration"). (AB SUF 66).

Purchase Agreement

AB and Warsteiner entered into a Purchase Agreement ("PA"), effective March 16, 2012, relating to the PATAGONIA mark for beer in the U.S.   (AB SUF 24; AB RSUF 50).  The PA contains several clauses governing the assignment of the ITU:

- The PA's second WHEREAS clause states that Warsteiner's application to register PATAGONIA "is an intent to use application and cannot currently be assigned to [AB]."  (Patagonia SUF 51).

- The PA's third WHEREAS clause states that "in order to assign [Warsteiner's application] to [AB], the Mark must be in use in the U.S., and such use must be documented in a Statement of Use filed with the U.S. Trademark Office."  (Patagonia SUF 52).

- The PA's fourth WHEREAS clause states that AB "wishes to obtain from [Warsteiner] a license to use the Mark in the U.S. in connection with beer which use shall inure to the benefit of [Warsteiner] for

United States District Court
Central District of California

purposes of perfecting the U.S. Application by demonstrating use of the Mark, thus enabling [Warsteiner] to transfer the application and/or resulting registration to [AB]."  (Patagonia SUF 53)

- The Purchase Agreement's fifth WHEREAS clause also states that Warsteiner "desires to grant [AB] such a license."  (AB RSUF 53).

The PA further provided that "Upon [AB's] . . . use of the Mark in accordance with this license, [AB], directly or through an attorney appointed through a Power of Attorney substantially in the form of Appendices II and IV hereto, shall file a Statement of Use with the U.S. Trademark Office in connection with the U.S. Application . . . ."  (AB SUF 32).  Finally, the PA stated that "after registration of the Mark, [Warsteiner] will execute the form of Assignment attached hereto as Appendix III (the Model Form of Assignment of U.S. Trademark) and transmit it to [AB]."  (AB SUF 33).

License Agreement

The PA and License do not include a requirement that AB would provide Warsteiner a sample of Quilmes' PATAGONIA brand beer, or of the packaging, labels, or display of the PATAGONIA mark to be used in the United States, or reports of sales, if any.  (Patagonia SUF 64).  The License does not provide for a royalty payment from AB to Warsteiner based on sales volume, (Patagonia SUF 71), and instead provides for compensation as a lump sum (AB RSUF 71).

On May 21, 2012, Quilmes told AB that Quilmes would apply AB's sticker labels "on top of the actual ones" already affixed to Quilmes' beer.

United States District Court
Central District of California

(Patagonia SUF 82).  Quilmes shipped PATAGONIA beer to Anheuser-Busch, LLC Sales of Hawaii ("AB of HI"), arriving on July 2, 2012, containing 2 pallets, each holding 112 cases containing 6 bottles each (224 total cases of beer).  (Patagonia SUF 87).  Between July 21, 2012 and August 24, 2012, AB of HI sold twenty-one (21) cases of beer, only to Vintage Wine Cellar and Tamura's Fine Wine and Liquor in Hawaii.  (Patagonia SUF 92).

On October 16, 2012, the PTO issued the trademark registration for PATAGONIA for beer in Warsteiner's name.  (Patagonia SUF 94).  On October 25, 2012, and November 19, 2012, AB sent emails to Warsteiner's Ms. Weig, attaching the registration certificate for the PATAGONIA mark and asking Warsteiner to sign and return the Assignment form.  (Patagonia SUF 95, AB RSUF 95).  On February 8, 2013, AB recorded the assignment from Warsteiner to AB, dated December 20, 2012, at the PTO.  (Patagonia SUF 101).  On February 22, 2013, AB corrected and reaffirmed its recordation of the assignment from Warsteiner to AB, dated December 20, 2012, clarifying that AB is an LLC.  (Patagonia SUF 102).

ITU Assignment

On or around November 29, 2012, Warsteiner delivered the executed assignment (Appendix III Model Form of the Assignment of the U.S. trademark) to AB for the first time.  (AB SUF 69).  The signed assignment that AB received from Warsteiner for the first time on or about November 29, 2012 was dated April 16, 2012.  (AB SUF 70).  On December 5, 2012, AB's outside counsel wrote to Warsteiner, noting that the assignment was dated April 16, 2012, and asking that Warsteiner send an assignment with a

current date.  (AB 75).  The parties agree that Warsteiner thought the date was "legally insignificant," (AB SUF 55; Patagonia RSUF 55), but Patagonia further asserts that Warsteiner was told it was not legally insignificant because AB instructed Warsteiner that "it is necessary for legal reasons to issue the Assignment of Trademark on a date from December or, as the case may be, a more current date."  (Patagonia RSUF 55).

Continuous Use

Between 2012 and 2015, AB made sporadic sales of PATAGONIA beer to retailers in Hawaii.  On or about July 2, 2012, AB imported the Patagonia beer from Quilmes in Argentina to Hawaii.  (AB SUF 53).  On July 13, 2012, AB sold Patagonia Amber Lager and Patagonia Bohemian Pilsner beer, through a wholly owned distributer, to a retailer in Honolulu, Hawaii.  (AB SUF 56).  By July 16, 2012, AB's Patagonia beer was available for purchase by consumers at a retailer in Honolulu, Hawaii.  (AB SUF 57).  Several of these retailers no longer have records of sales for the period between 2012 and 2014.  (AB SUF 220-22).  The parties do not dispute that between March 20, 2015, and June 19, 2015, AB sold 10 case of PATAGONIA beer to retailers in Hawaii.  (AB SUF 108).

Between May 2016, after the World Beer Cup, and December 31, 2016, there is no evidence of sales by AB of PATAGONIA beer.  (Patagonia SUF 105; AB RSUF 105).  Between January 1, 2018 and September 5, 2018, there is no evidence of sales by AB of PATAGONIA beer.  (Patagonia SUF 106).

United States District Court
Central District of California

United States District Court
Central District of California

On October 5, 2018, Mr. Davidovits submitted a declaration to the PTO swearing on AB's behalf that the PATAGONIA "mark has been continuously used in commerce for five (5) consecutive years after the date of registration … and is still in use in commerce on or in connection with all goods/all services … listed in the existing registration..." (Patagonia SUF 122; AB SUF 137-138).  Prior to October 5, 2018, the PTO website showed that AB had not filed its declaration of use of PATAGONIA for beer.  (Patagonia SUF 128).

Patagonia's Knowledge of the Registration

On October 10, 2013, Plaintiffs' outside counsel emailed Plaintiffs' trademark paralegal about "US Registration – the mark PATAGONIA" that listed "PATAGONIA for beer" along with third-party registrations for PATAGONIA for various goods.  (AB SUF 165).  On or about November 12, 2013, Patagonia, Inc. launched a beer called "California Route" in partnership with New Belgium.  (AB SUF 166). In connection with the launch of California Route, Patagonia, Inc.'s spokesperson made clear that it was "not getting into the beer business in a permanent way."  (AB SUF 167).  Plaintiffs admit that they considered using and "likely refrained from using its PATAGONIA branding on beer products themselves at that time as a result of AB's ostensible claim to own those rights."  (AB SUF 168).  Plaintiffs did not challenge AB's PATAGONIA Registration in 2013 or at any time before it filed this Action.  (AB SUF 169).  Indeed, the parties do not dispute that, during this time period, Patagonia appeared to believe that AB owned the rights to the PATAGONIA mark for beer, and considered trying to purchase the rights.  (*See* AB SUF 171-83, 191-92, 197).

United States District Court
Central District of California

**B.   Disputed Facts**

In early 2011 and into March 2012, AB contends that Warsteiner and AB negotiated regarding a potential license of the PATAGONIA mark for use in the United States.  (AB SUF 11-13).  Patagonia disputes this, arguing that AB and Warsteiner negotiated regarding a potential purchase of the mark, not licensing. The parties dispute whether the License Agreement had quality control protections or remedies.  (AB SUF 36; Patagonia RSUF 36). The parties offer competing explanations for why Warsteiner initially signed the assignment on April 16, 2012 and only later changed it to December 20, 2012.  (AB SUF 74; Patagonia RSUF 74; AB RSUF 50).  They further dispute whether the original April 16, 2012 date was consistent with the terms of the Purchase Agreement.  (*Id.*).

The parties dispute whether the Patagonia beer in Argentina features a substantially similar label and background, and same shaped bespoke bottle as that used in the U.S.  (AB SUF 125; Patagonia RSUF 125).  They further dispute whether AB distributed PATAGONIA branded merchandise, such as fleece jackets and other items Patagonia sells, to promote the launch of their new beer.  Indeed, Patagonia argues that "AB put PATAGONIA on jackets, scarves and winter hats, and distributed the apparel to employees and those serving its beer to customers in connection with the launch and that, "[i]n connection with the launch of its PATAGONIA beer, AB served the beer to consumers at ski slopes, with its employees and representatives wearing PATAGONIA apparel."  (Patagonia SUF 119-20). AB argues that, "in September 2018, AB" merely "communicated by email

United States District Court
Central District of California

with Staples about creating a limited number of promotional items with its Cerveza Patagonia brand, including tshirts and fleeces."  (AB RSUF 120).

AB argues that the sustainability element of the U.S. brand stems from the Argentinian brand's commitment to the environment, a contention Patagonia disputes.  (AB SUF 133; Patagonia RSUF 133).

## IV.   DISCUSSION

Under the Lanham Act, federal courts have the authority to cancel an invalid trademark registration.  *See Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 869 (N.D. Cal. 2012), *aff'd*, 737 F.3d 546 (9th Cir. 2013) (citing 15 U.S.C. § 1119.  In this action, both parties claim the rights to the PATAGONIA mark, and both parties move for summary judgment on certain trademark cancellation claims.  Patagonia's Fifth, Sixth, Seventh, and Eighth Claims seek to cancel AB's PATAGONIA trademark (Registration No. 4,226,102) on numerous grounds.  (TAC ¶¶ 86-107).  Patagonia moves for summary judgment on its Fifth Claim, premised on anti-trafficking, as well as its Ninth Claim, trademark rectification.  AB moves for summary judgment on all of Patagonia's cancellation claims, as well as its Third Counterclaim for declaratory relief.  The Court considers each claim below.

### A.   Claim 5: Anti-Trafficking, 15 U.S.C. § 1060(a)(1)

Both parties move for summary judgment on Plaintiff's Fifth Claim, addressing trademark cancellation on the basis of violation of the Lanham Act's anti-trafficking provision.  The Lanham Act 's anti-trafficking rule

prohibits the sale of an intent-to-use application ("ITU") before an applicant verifies under oath that the mark has been used in commerce.  15 U.S.C. § 1060(a)(1) ("Section 10(a)") ("[N]o application to register a mark under section 1051(b) of this title [allowing ITUs] shall be assignable prior to the . . . filing of the verified statement of use under section 1051(d) of this title."). Assignment of an ITU is permitted "to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing."  (*Id.*).  Thus, "an intent-to-use application cannot be assigned before the applicant files a verified statement that he or she is using the mark, unless the part of the applicant's business that pertains to the mark is also assigned and that business is still 'ongoing and existing.'" *See also Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204, at *7 (C.D. Cal. June 8, 2015).

Patagonia argues that AB violated the anti-trafficking rule, and therefore that its registration of the PATAGONIA mark must be cancelled pursuant to § 1064 of the Lanham Act.  (Dkt. 235 at 20).  AB also moves for summary judgment on the anti-trafficking claim on two grounds.  AB first argues that it did not violate the anti-trafficking rule at all, and also contends that Patagonia's trademark cancellation claim under § 1060(a) is barred because "violation of § 1060(a) is not a ground for cancellation enumerated in § 1064(3)," and therefore, even if AB did violate the anti-trafficking rule, cancellation of the PATAGONIA mark pursuant to § 1064(3) would not be appropriate.  (Dkt. 249 at 7).

United States District Court
Central District of California

1.   Anti-Trafficking and Trademark Cancellation

AB argues that violation of the anti-trafficking rule cannot serve as a basis for trademark cancellation pursuant to Lanham Act § 1064. Specifically, AB states that "[a] claim that a mark did not meet the use requirement for registration amounts to a claim that the registration was 'void ab initio.'" (Dkt. 244 at 17, quoting *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009)).  AB further cites to cases in which "§ 1064(3) barred cancellation claims brought solely for lack of use prior to registration."  (Dkt. 291 at 23).

Patagonia, however, challenges not only the validity of AB's registration on the grounds that AB has failed to meet the use requirement, but also the validity of the assignment of the registration itself.  "Violating [the] 'anti-trafficking rule' voids the assignment as well as the underlying application and resulting registration."  *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204, at *7 (C.D. Cal. June 8, 2015) (citing *The Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d 1098, 1104 (T.T.A.B. 1996)); *see also Sebastian Brown Prods. LLC v. Muzooka Inc.*, No. 15-CV-01720-LHK, 2016 WL 5910817, at *7 (N.D. Cal. Oct. 11, 2016).  "[O]nly after a valid assignment of trademarks does the assignee succeed to the rights of the assignor."  *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 68 (2d Cir. 2010).  Where such an assignment is invalid, trademark cancellation is an appropriate remedy.  *See Emerald Cities Collaborative, Inc. v. Roese*, 666 F. App'x 908, 912 (Fed. Cir. 2016) (cancelling trademark where "Agreement [between licensor and licensee] constituted an improper assignment of the intent-to-use application prior to the filing of the SOU").

United States District Court
Central District of California

AB's argument that violation of the anti-trafficking rule is not grounds for trademark cancellation fails as a matter of law.

2.   Whether AB Violated the Anti-Trafficking Rule

Having established that violation of the anti-trafficking law is grounds to cancel the trademark registration, the Court next determines whether AB violated the trafficking rule.  Patagonia argues that AB violated the anti-trafficking rule by acquiring Warsteiner's ITU in order to register the PATAGONIA trademark for beer.  (Dkt. 235 at 1).  Specifically, Patagonia argues that AB purchased the Patagonia ITU from Warsteiner *after* Warsteiner had already decided it did not want to pursue a trademark application.  Patagonia further contests the validity of the licensing agreement and the accrual of goodwill to Warsteiner before the sale of the ITU to AB.

Patagonia states that in 2010 or 2011, "AB took steps to acquire Warsteiner's PATAGONIA ITU," at which time "Warsteiner repeatedly made it clear that it had nothing else but the ITU to offer AB."  ((Dkt. 235 at 4).  To avoid an "as-is" sale of the ITU, in violation of the anti-trafficking rule, Patagonia asserts that "AB used a power of attorney to take control of the ITU while leaving it nominally in Warsteiner's name," "contrived a few sales of its Argentine affiliate's PATAGONIA branded beer under a sham license from Warsteiner[,] and, on that basis, swore in the PTO that Warsteiner had made the required use."  (Dkt. 235 at 1) (emphasis omitted).

United States District Court
Central District of California

Patagonia argues that Warsteiner's use of the ITU did not create goodwill for several reasons.  First, Patagonia contends that Warsteiner's use of the ITU, while Warsteiner was effectively controlled by AB, renders that use invalid for the purposes of acquiring the registration.  Thus, Patagonia argues, the license terms did not produce any goodwill.  (Dkt. 235 at 19).  That Warsteiner's sales of PATAGONIA beer occurred while AB had power of attorney, however, is not by itself fatal.  As courts in this district have explicitly held, "the owner of an unprotectable name can license the name's use to a third party, and if that third party is then the first to use the name in commerce, thereby creating a protectable trademark, then the use of the mark inures to the benefit of the person who owns the name." *Mindys Cosmetics, Inc. v. Dakar*, No. CV 08-4459 SVW (RZx), 2009 WL 10669480, at *5 (C.D. Cal. July 14, 2009).  Here, Warsteiner still owned the name and the ITU at the time of the required sales.  Thus, providing the license was valid, goodwill from sales of PATAGONIA branded beer accrued to Warsteiner.

Patagonia also contests the validity of the licensing agreement, however, stating that "that licenses do not create goodwill unless the trademark owner is granted and exercises the right to control quality."  (Dkt. 235 at 19).  This argument is more persuasive.  "It is well-established that "[a] trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained." *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595–96 (9th Cir. 2002) (quoting *Moore Bus. Forms, Inc. v. *596 Ryu,* 960 F.2d 486, 489 (5th Cir.1992)).  Nevertheless, "[u]ncontrolled

United States District Court
Central District of California

or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *Id.* (quoting *McCarthy on Trademarks and Unfair Competition* § 18:48, at 18–79 (4th ed.2001)). *See also, e.g.*, *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 512 (9th Cir. 2010) (finding that licensor who "(1) did not retain express contractual control over [licensee's] quality control measures, (2) did not have actual controls over [licensee's] quality control measures, and (3) was unreasonable in relying on [licensee's] quality control measures" had "engaged in naked licensing" and therefore "abandoned its trademarks").

According to AB, however, the license did have quality controls. Paragraph 2 of the License Agreement, titled "Quality Control," requires that any beer sold under the PATAGONIA mark comply with U.S. law, including "all labeling and food standard laws and regulations," and be "of a quality comparable to [the beer] brewed and sold by [Quilmes] under the brand name Patagonia in Argentina." (Dkt. 254-2, AB RSUF,177). Yet as Patagonia points out, "[p]egging the contract to Quilmes's standards" is insufficient to ensure Warsteiner had actual control because "if Quilmes changed PATAGONIA to a low priced, low alcohol beer, for example, the quality 'standard' would follow Quilmes's direction and would not be a 'breach.'" (Dkt. 344 at 6). *See Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1131–32 (9th Cir. 2006) (to comply with the requirements of the Lanham Act, quality control provisions must "'reflect[] the goodwill and quality standards' of [the licensor], as opposed to the [licensee's]").

United States District Court
Central District of California

1    AB also argues that the License Agreement provided Warsteiner with

2  the right to terminate for breach if AB did not comply with the quality control

3  terms.  (Dkt. 254-2, AB RSUF, 178).  To support this assertion, however, AB

4  cites only to the deposition testimony of Francis Z. Hellwig stating that, if

5  Warsteiner was unhappy with the quality of the beer AB sold under the

6  license, "[t]he remedies available to Warsteiner·would be remedies

7  generally available for breach of an agreement," but that Hellwig was "really

8  not in a position to opine on what all those potential remedies are."  (Dkt.

9  254-5 at 200:16-201:6).  Patagonia points out, in turn, that "the text of the

10  license does not include any provision authorizing WIA to terminate if the

11  quality provision is 'breached.'"  (Dkt. 344 at 12).  AB has provided no

12  evidence to the contrary.  Accordingly, the Court concludes that Patagonia

13  has raised a triable issue of fact regarding whether AB's license from

14  Warsteinger contained the requisite quality control provisions required under

15  the Lanham Act, and therefore whether the license was valid at all.  *See*

16  *FreecycleSunnyvale*, 626 F.3d at 512.  If the license were a "naked" license,

17  Warsteiner would have abandoned the mark and would have had no

18  goodwill to transfer to AB to accompany the ITU, rendering the assignment

19  of those rights to AB invalid.

20

21    Finally, Patagonia argues that, even if the quality control provisions were

22  sufficient and the license were valid, AB would still have violated the anti-

23  trafficking rule because Warsteiner's assignment of the ITU was fraudulent.

24  On this point, too, there is a factual dispute.  Patagonia argues that "AB . . .

25  had Warsteiner post-date an assignment to make it look like the purchase

26  happened after Warsteiner had obtained the registration."  (Dkt. 235 at 1,

11-12).  Patagonia asserts that Warsteiner signed and dated the Assignment form April 16, 2012, a date "consistent with all of the other documents," and returned it to AB on November 29, 2012.  (Dkt. 235 at 11).  Patagonia contends that AB rejected the document because it knew "the anti-trafficking rule required the assignment to occur after the statement of use was filed (July 17, 2012), and Warsteiner's April-dated assignment would have revealed the violation."  (*Id.*).  Patagonia states that, after AB told Warsteiner to execute another version with "a more recent date," specifically, "a date 'in December, 2012,'" Warsteiner did so, returning the Assignment form dated December 20, 2012.  (*Id.*).

AB provides a different explanation, arguing that "AB noticed that [the assignment document] was dated April 16, 2012," a date "*inconsistent* with the terms of the Purchase Agreement, as well as the actual date of the assignment."  (AB SUF 74; Dkt. 280 at 19) (emphasis added).  AB asserts that this inconsistency is the reason AB instructed Warsteiner to re-execute the agreement.  (Dkt. 280 at 19 ("[B]ecause [the assignment] bore an April signature date that was inconsistent with the parties' agreement and did not reflect the true date of assignment, AB asked Warsteiner to re-execute it with a current date.")).  The parties, in sum, dispute whether Warsteiner's changing of the date on the assignment document, whose final date suggests compliance with the anti-trafficking rule, was fraudulent.

The Court concludes that there exists a genuine dispute of material fact as to whether AB violated the anti-trafficking rule, and DENIES both Patagonia's and AB's MSJs as to Patagonia's Fifth Claim.

United States District Court
Central District of California

**B.   Claim 9: Trademark Rectification**

Patagonia also argues that, even if the mark had been assigned properly, it would not be incontestable because AB failedto meet the use requirement.  Under the Lanham Act, "[a] mark attains incontestable status in a category if the registrant continuously uses the mark for five consecutive years after registering it in that category[.]"  15 U.S.C. § 10652; *see also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1139 n.1 (9th Cir. 2002).  A district court may "rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.  According to Patagonia, "AB never used the mark continuously for five years and its claimed mark thus is not incontestable."  (Dkt. 235 at 22).  Patagonia moves for "summary judgment on Patagonia's rectification claim" and asks this Court to "strip AB's registration of incontestability status."  (*Id.*; *see* TAC ¶¶ 108-112).

The parties dispute whether AB used the mark continuously for five years.  AB argues that its "beer [was] sold on a limited basis in test markets before a wider launch."  (Dkt. 249 at 21), relying on *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1176, 1178 (E.D. Cal. 2016), to support its claim that "limited, seasonal" beer sales to select retailers is sufficient to establish incontestability.  Yet AB does not state that its beer was seasonal, or that it was sold with any regularity.  Furthermore, as discussed below, AB has failed to raise genuine factual issues in response to Patagonia's evidence of AB's inconsistent use of the PATAGONIA mark.

United States District Court
Central District of California

Patagonia argues that AB has not used the PATAGONIA mark continuously for five years, stating that "there is no evidence of sales of PATAGONIA beer by AB in the United States between August 24, 2012 and March 19, 2015." (Patagonia SUF 104).  AB has failed to provide specific records of sales from this period.  "In its responses to" Patagonia's discovery requests, "AB state[d] that 'it has not yet located any records of its sale to an outside distributor of PATAGONIA beer' in 2013 or 2014.'"  (Yang Decl., Dkt. 235-25, ¶ 45; *see also* AB's response to Patagonia's SUF). Patagonia argues further that "AB made no sales at all of PATAGONIA beer . . . from May 2016 to December 2016.  (Dkt. 235 at 13; SUF 105).  AB attempts to dispute this by stating that "[i]n May 2016, PATAGONIA beer also participated in the World Beer Cup, an international beer tasting competition held in the U.S." (Dkt. 254-2 at 52).  Nevertheless, even accepting this as true, AB still has failed to produce any sales records indicating any use of the PATAGONIA label between June and December 2016.  Once more, AB argues that there *may* exist records that document sales during that time period, but has not produced such records.

It is well established that mere assertions, unsupported by evidence, are insufficient to create a genuine issue of material fact. *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982) (affirming summary judgment because a "speculative opinion" does not "create[] a factual issue" absent actual evidence).  The Court accordingly concludes that AB did not use the PATAGONIA mark continuously for five years and GRANTS Patagonia's Motion for Summary Judgment on its Ninth Claim.

United States District Court
Central District of California

**C.   Claim 8: Fraud**

AB seeks summary judgment in its favor on Patagonia's Eighth Claim, trademark cancellation for fraud.  To establish that a party has committed fraud on the PTO, a litigant must show: (1) a false statement of material fact; (2) the registrant's knowledge or belief that the statement is false; (3) intent to induce reliance; (4) reasonable reliance; and (5) damages proximately resulting from the reliance.  *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013).

The Court notes at the outset that, although a higher standard applies to *prevailing* on a fraud claim, the "no genuine dispute" standard applies to survive summary judgment on such a claim.  *See Privado Mktg. Grp. LLC v. Eleftheria Rest Corp.*, No. 13 CIV. 3137 (ER), 2017 WL 1167332, at *8 (S.D.N.Y. Mar. 27, 2017) ("While it is true that to prevail on their counterclaim for cancellation due to fraud, Defendants must show the elements by clear and convincing evidence, 'to survive summary judgment,' the party alleging fraud must only show that there is a 'genuine issue' as to the elements required to prove fraud.") (citing *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1041-42 (C D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013)).

Patagonia alleges that, "[b]ecause AB and Warsteiner procured the registration by fraud, the registration must be cancelled."  (TAC ¶ 107). Patagonia's fraud claim is based on AB's alleged "fail[ure] to disclose in certain trademark filings that it took an invalid assignment of an intent-to-use ("ITU") application for PATAGONIA before any statement of use was filed."

(Dkt. 244 at 1).  Specifically, Patagonia argues that "AB hid its acquisition from the PTO by (a) acting as if WIA still owned the ITU, (b) pretending that WIA had made use, and (c) even omitting that WIA's purported use was solely through a licensee."  (Dkt. 291 at 4).  As discussed above, the Court denied AB's motion for summary judgment as to the anti-trafficking claim; thus, AB's attack on Patagonia's Eighth Claim fails.

Furthermore, violation of the anti-trafficking rule is only one basis for the alleged fraud.  As Patagonia notes, it incorporated by reference all of its prior allegations, including those regarding its incontestability claim, in its fraud claim.  (*See* Dkt. 291 at 21; TAC ¶ 103 ("Plaintiffs reallege and incorporate by reference each of the allegations contained in paragraphs 1 through 96 of this Amended Complaint.")).  Specifically, Patagonia argues that "AB made no use [of the mark] for six years after registration (Dkt. 100 ¶ 30), but nonetheless swore to the PTO that use had been continuous for five years."  (Dkt. 291 at 11, citing TAC ¶ 31).  As discussed above, the Court finds that AB did *not* continuously use the PATAGONIA mark for five years.  The Court concludes that there exists, at the least, a genuine question of material fact as to whether AB committed fraud on the PTO, and accordingly DENIES AB's MSJ as to Plaintiff's Eighth Claim.

## D.   Claim 6: False Connection, 15 U.S.C. § 1052(a)

AB moves for summary judgment on Patagonia's Sixth Claim, trademark cancellation, pursuant to 15 U.S.C. § 1052(a), on the grounds that the PATAGONIA mark on AB's beer falsely suggests a connection with Patagonia, Inc.  15 U.S.C. § 1052(a) provides that "[n]o trademark by which

United States District Court
Central District of California

the goods of the applicant may be distinguished from the goods of others

shall be refused registration . . . unless it [c]onsists of or comprises immoral,

deceptive, or scandalous matter; or matter which may disparage or falsely

suggest a connection with persons, living or dead, institutions, beliefs, or

national symbols, or bring them into contempt, or disrepute[.]"  15 U.S.C.A.

§ 1052(a).  AB has failed to establish it is entitled to summary judgment on

this claim.

The Trademark Trial and Appeals Board (TTAB) has described a four-

factor test to determine whether an applicant has violated 15 U.S.C. §

1052(a), examining:

> (1) Whether Applicant's mark [] is the same as or a close
> approximation of [another party's] previously used name or identity;
> (2) Whether Applicant's mark [] would be recognized as such by
> purchasers, in that the mark points uniquely and unmistakably to [the
> other party's mark];
> (3) Whether [the other party] is not connected with the goods that will
> be sold by Applicant under its mark; and
> (4) Whether [the other party's] name or identity is of sufficient fame or
> reputation that when Applicant's mark is used on Applicant's goods, a
> connection with [the other party] would be presumed.

*In Re Nieves & Nieves LLC*, 113 U.S.P.Q.2d 1629 (T.T.A.B. 2015).

Here, AB argues that "[a]ny claim that consumers necessarily would

have presumed in 2012 that PATAGONIA beer came from a clothing

company that did not sell beer is implausible and unsupported."  (Dkt. 244 at

2).  Given the similarity in the marks, the Court disagrees.  AB's

27

United States District Court
Central District of California

PATAGONIA label, as used on its beer and other promotional goods, is almost identical to the logo Patagonia uses on its own goods.  Both feature prominently the word "Patagonia," accompanied by an outline of a mountain range.  (*See, e.g.*, Dkt. 108 at 2, Dkt. 257-11 at 2 (showing AB's "PATAGONIA Cerveza" logo); AB SUF 125 (showing AB's PATAGONIA Bohemian Pilsner bottle); Dkt. 261-14 (showing Patagonia branded apparel)).  The Court finds that purchasers are likely to recognize AB's mark as highly similar to Patagonia's.

Courts look not only to purchasers' impressions but also to retailers' intentions in evaluating false connection claims.  The Federal Circuit has held that evidence of intent "would be highly persuasive that the public will make the intended false association." *Id.* at 1377 (emphasis added). *Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.*, 703 F.2d 1372 (Fed. Cir. 1983).  Patagonia has provided evidence of AB's intent here as well, showing that "AB repeatedly referenced Patagonia's brand and company in the course of developing its PATAGONIA beer," mimicked Patagonia's logo, "create[ed] advertising strategies that explicitly target customers of "Patagonia (clothing)," and "print[ed] 'PATAGONIA' and its . . . mountain silhouette on fleece jackets and other apparel – Patagonia's core products – to coincide with" the launch of PATAGONIA beer.  (Dkt. 291 at 16-17).  AB disputes these contentions.  At the very least, Patagonia's arguments and evidence raise a triable issue of fact as to whether AB intended a false association here.

United States District Court
Central District of California

1    Finally, although AB argues that it "actually operates a brewery in the

2    Patagonia region, and its U.S. beer is made from Cascade hops from

3    Patagonia," this is insufficient to establish that the "PATAGONIA name does

4    not . . . point[] uniquely and unmistakably to the clothing company[.]"  (Dkt.

5    244 at 22 (internal citation omitted)).  In other words, AB's PATAGONIA beer

6    can hail from the Patagonia region and yet still carry a logo that is intended

7    to draw a false connection to the Patagonia brand.

8

9    In short, Patagonia has adduced sufficient evidence to raise a genuine

10   dispute of material fact as to the false connection claim, and the Court

11   accordingly DENIES AB's Motion for Summary Judgment as to Claim 6.

12

13   **E.   Claim 7: Misrepresentation of Source, 15 U.S.C. § 1064(3)**

14   AB moves for summary judgment on Patagonia's claim under 15 U.S.C.

15   § 1064(3), fraud in obtaining a trademark registration.  15 U.S.C. § 1064(3)

16   provides that "[a] petition to cancel a registration of a mark. . . may . . . be

17   filed . . .  by any person who believes that he is or will be damaged,

18   including as a result of a likelihood of dilution by blurring or dilution by

19   tarnishment under section 1125(c) of this title, by the registration of [that]

20   mark . . . if the registered mark is being used by, or with the permission of,

21   the registrant so as to misrepresent the source of the goods or services on

22   or in connection with which the mark is used."  Both parties refer to this as a

23   "passing off" claim.  (*See* Dkt. 244 at 21; Dkt. 291 at 20).

24

25   "Passing off ... occurs when a producer misrepresents his own goods or

26   services as someone else's."  *OTR Wheel Eng'g, Inc. v. W. Worldwide*

29

United States District Court
Central District of California

1  *Servs., Inc.*, 897 F.3d 1008, 1016 (9th Cir. 2018).  To succeed on a "passing

2  off" claim, a party must show "blatant misuse of the subject mark by

3  [registrant] in a manner calculated to trade on the goodwill and reputation of

4  [the other party]."  *NSM Res. Corp. v. Microsoft Corp.*, 2014 WL 7206403, at

5  *6 (TTAB Nov. 25, 2014).  Patagonia has raised triable issues of fact

6  regarding this claim.  Indeed, much of the evidence the Court detailed

7  above, regarding Patagonia's Sixth Claim, is applicable here.

8

9      To the extent AB is arguing that, because Patagonia does not produce a

10  beer named "Patagonia," AB could not have "passed off" its own

11  PATAGONIA beer as a Patagonia product, such a contention lacks merit.

12  Patagonia has provided evidence showing that its Patagonia logo and AB's

13  PATAGONIA logo are highly—and perhaps intentionally—similar; that AB's

14  own employees or contractors were confused about the difference between

15  Patagonia's Long Root Ale beer and AB's PATAGONIA beer; and that

16  customers actually were confused about whether the PATAGONIA beer was

17  affiliated with Patagonia.  (*See* Dkt. 291 at 21-22).  Patagonia has further

18  provided evidence supporting its argument that AB intentionally coopted

19  Patagonia's image and identity.  Patagonia has provided evidence

20  suggesting, for example, that "AB created documents for AB's PATAGONIA

21  brand development and launch that explicitly reference Patagonia, Inc.'s

22  Patagonia brand, and define advertising strategies that target customers of

23  'Patagonia (clothing).'"  (Dkt. 291-1 at 193).  Such evidence is sufficient to

24  raise a factual dispute regarding whether AB intentionally tried to pass off its

25  own beer as a Patagonia product.  The Court accordingly DENIES AB's

26  Motion for Summary Judgment as to Patagonia's Seventh Claim.

**F.  Timing Defenses to Fraud Cancellation Claims**

Having denied summary judgment on the merits of AB's fraud claims, the Court considers AB's affirmative defenses regarding timeliness.  AB raises two distinct timing defenses, which the Court discusses below.

1.  Statutes of Limitations

AB argues that Patagonia's fraud cancellation claims are "time-barred under California's applicable three-year statute of limitations for fraud." (Dkt. 244 at 1-2).  This proposition is unsupported by the law.  The Ninth Circuit is clear that "[t]he Lanham Act . . . provides that a petition for cancellation may be brought '[a]t any time[.]'"  *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1024 (9th Cir. 2018) (quoting 15 U.S.C. § 1064).  Courts in this district have faithfully applied this holding. *See Kleven*, 2015 WL 4977185, at *27 ("[T]he Lanham Act specifically provides that there is no limitation on when a party can bring a cancellation claim based on abandonment and fraud.").  AB's statute of limitations defense fails.

2.  Laches

AB next argues that Patagonia's trademark cancellation claims are barred under the doctrine of laches due to Patagonia's "unreasonable and prejudicial six-plus year delay in filing this suit."  (Dkt. 244 at 2).  Patagonia, in turn, argues that AB's laches defense fails because "(1) AB lacks standing to assert laches; (2) Patagonia timely filed suit; and (3) AB suffered no material prejudice resulting from delay."  (Dkt. 235 at 24).  Both parties move for summary judgment on this defense.  (Dkt. 280 at 23).

1

2　　　　Laches is an equitable time limitation on a party's right to bring suit,

3　resting on the maxim that one who seeks the help of a court must not sleep

4　on his rights. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835

5　(9th Cir. 2002). The elements of laches are (1) an unreasonable delay in

6　bringing suit; and (2) prejudice to the defendant caused by the delay. Seller

7　Agency Council v. Kennedy Center for Real Estate Educ., 621 F.3d 981, 989

8　(9th Cir. 2010); *accord Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880

9　F.3d 1109, 1115 (9th Cir. 2018).  Thus, "[e]ven where a defendant

10　establishes that a plaintiff delayed unreasonably in filing suit, laches will not

11　bar a claim unless that delay prejudiced the defendant."  *Eat Right Foods*

12　*Ltd.*., 880 F.3d at 1119.  "Because the application of laches depends on a

13　close evaluation of all the particular facts in a case, it is seldom susceptible

14　of resolution by summary judgment."  *Couveau v. American Airlines, Inc.*,

15　218 F.3d 1078, 1083 (9th Cir. 2000).  "Although the application of the laches

16　doctrine to the facts is at the discretion of the trial judge, when it comes to

17　determining what those facts are, the usual summary judgment standards

18　apply."  *Eat Right Foods Ltd.*, 880 F.3d at 1117.

19

20　　　　To determine whether a party unreasonably delayed, courts "look[] to

21　whether the most analogous state statute of limitations has expired."

22　*Pinkette*, 894 F.3d at 1025.  If plaintiff fails to sue within the relevant

23　limitations period, "there is a strong presumption in favor of laches."  *Id.*  The

24　Ninth Circuit is clear that "the presumption of laches is triggered if any part

25　of the claimed wrongful conduct occurred beyond the limitations period"

26　because "[t]o hold otherwise would "effectively swallow the rule of laches,

and render it a spineless defense." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) (internal quotations and citations omitted).  Thus, "in determining the presumption for laches, the limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action."  *Id.*

Both AB and Patagonia move for summary judgment on AB's laches defense as applied to Patagonia's anti-trafficking claim.  (*See* Dkt. 235 at 24; Dkt. 244 at 24).  AB argues, in effect, that because Patagonia knew about the registration, Patagonia should have been on notice of the anti-trafficking claim.  As Patagonia points out, however, that "[w]hen the registration issued, WIA was identified as the registrant and no amount of investigation would have revealed actual, much less constructive, notice of the private deal between WIA and AB to sell the ITU."  (Dkt. 344 at 11) (emphasis omitted).  The Court agrees.

With its anti-trafficking claim, Patagonia challenges not the registration itself (and how it appeared in the PTO Register), but rather the validity of the underlying transactions, about which Patagonia only gathered information in 2018.  As several courts have recognized, although "constructive knowledge is enough to start the laches evaluation period," *Eat Right Foods Ltd.*, 880 F.3d at 1116, a party is "not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of its shotgun instantly upon spotting a possible infringer," *Synoptek*, 2018 WL 3359017, at *7. Thus, "the period of delay in bringing a claim is measured from the date when a potential claimant receives or should have gathered reliable

United States District Court
Central District of California

1  information establishing the basis for a claim[.]" *Cellularm Inc. v. Bay Alarm*

2  *Co.*, No. C-89-3409 DLJ, 1991 WL 332052, at *9 (N.D. Cal. Apr. 11, 1991).

3  *See also SunEarth, Inc. v. Sun-Earth Solar Power Co.*, No. C 11-4991 CW,

4  2012 WL 368677, at *16 (N.D. Cal. Feb. 3, 2012) ("[U]nreasonable delay in

5  a trademark infringement case is measured from when the plaintiff knew or

6  should have known about its potential cause of action.").

7

8  AB also claims that laches bars Patagonia's Six and Eighth Claims for

9  cancellation on the basis of fraud and false connection. (Dkt. 244 at 24 &

10  n.5). The Court find the laches defense fails as applied to these claims as

11  well. Patagonia initiated this action in April 2019. (Dkt. 1). AB argues that

12  laches began to run from July 4, 2007, when AB first published the

13  PATAGONIA beer mark for opposition. (Dkt. 244 at 25). With respect to

14  Patagonia's Eighth Claim, the Court has held that AB's statements

15  regarding continuous use can serve as the basis for Patagonia's fraud

16  claim. As Patagonia points out, AB did not file an incontestability affidavit, in

17  which is represented it had made continuous use of the mark, until October

18  2018. (Dkt. 235 at 25). Clearly, Patagonia could not have known it had

19  grounds to contest the incontestability claim prior to that affidavit being filed.

20  The Court accordingly finds that Patagonia did not unreasonably delay

21  when it brought this action less than a year later.

22

23  As to Patagonia's Sixth Claim, for false connection, AB states, in a

24  footnote, that "[Patagonia's] passing off claim appears to be based on more

25  recent conduct, but if based on conduct pre-dating April 9, 2015, laches

26  would also bar that claim." (Dkt. 244 at 24 n.5) (internal citation omitted).

The Court agrees that the claim is based on more recent conduct, and accordingly finds the laches defense inapplicable to this claim.  The Court accordingly DENIES summary judgment as to AB's laches defense.

### G.   Counterclaim 3: Declaratory Relief of Validity of Registration

Finally, AB asks this Court to "grant summary judgment on AB's Third Counterclaim for declaratory relief and declare that AB's Registration is valid and that AB has exclusive rights to use PATAGONIA on or in connection with beer in the U.S."  (Dkt. 244 at 30 (internal citations omitted)).  For the reasons stated above, the Court DENIES AB's MSJ as to its Third Counterclaim for Declaratory Relief of Validity of Registration.[1]

### V.   CONCLUSION

The Court therefore GRANTS Patagonia's Motion for Partial Summary Judgment IN PART and awards summary judgment to Patagonia as to Patagonia's Ninth Claim.  The Court DENIES AB's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

Dated:   9/3/20

Virginia A. Phillips
United States District Judge

---

[1] Additionally, summary judgment is inappropriate on this claim because, as Patagonia points out, "AB has not moved on Patagonia's Ninth Claim," for trademark rectification[.]"  (Dkt. 257 at 30 n.17). .Therefore, "[a] judgment against Patagonia on [the above] cancellation claims . . . would create, at most, a presumption of validity, not conclusive validity" pursuant to 15 U.S.C. § 1115(a).  (*Id.*).

United States District Court
Central District of California

35

United States District Court
Central District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26